# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-KA-00148-SCT

*MONTE CROSSWHITE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 1/24/97 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JIM WAIDE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/31/98 |
| MOTION FOR REHEARING FILED: | 1/21/99 |
| MANDATE ISSUED: | 4/22/99 |

**BEFORE PITTMAN, P.J., SMITH AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. On April 5, 1996, Monte Crosswhite was indicted in the Circuit Court of Clay County for the unlawful manufacture of methamphetamine, a Schedule II drug, in violation of Miss. Code Ann. § § 41-29-139 and 41-29-115. Crosswhite was found guilty of manufacturing a controlled substance by a jury of his peers and was sentenced to pay a fine of five thousand dollars ($ 5,000.00) and serve a period of five (5) years in the custody of the MDOC. Crosswhite subsequently filed a motion for acquittal or a new trial which was denied by the Circuit Court on January 24, 1997. Aggrieved, Crosswhite raises three issues on appeal:

> **I. WHETHER THE ACT OF BOILING VICKS INHALERS CONSTITUTES THE CRIME OF MANUFACTURING A CONTROLLED SUBSTANCE PURSUANT TO MISS. CODE ANN. § § 41-29-139 AND 41-29-115.**

> **II. WHETHER THE INTRODUCTION OF THE DEFENDANT'S PRIOR BAD ACTS**

**AND SUBSEQUENT REFERENCE TO THESE ACTS DURING CLOSING ARGUMENT DENIED THE DEFENDANT A FAIR TRIAL.**

**III. WHETHER AN ENVELOPE ON WHICH THE INGREDIENTS USED TO MANUFACTURE METHAMPHETAMINE WERE WRITTEN WAS PROPERLY ADMITTED INTO EVIDENCE.**

## STATEMENT OF FACTS

¶2. Based upon knowledge of a previous sale of marijuana from the home of Summer Studdard, Mississippi Bureau of Narcotics officers obtained a warrant to search the Studdard home for marijuana and any drug contraband contained therein. At approximately 11:30 p.m. on September 22, 1995, officer Joe Huffman and Deputy Chief Bill Gibson executed the search warrant and gained entry into the house. Upon entry, Huffman immediately smelled an odor in the house which burned his eyes and throat. He then entered the kitchen and found Monty Crosswhite standing over the stove holding a pair of pliers. On the stove they found a white bowl containing a clear liquid. Huffman immediately placed handcuffs on Crosswhite. As Huffman looked around the kitchen, he noticed approximately fifty (50) empty Vicks Inhaler containers lying on the stove, counter top, and in the garbage can next to the stove. After the liquid cooled, Huffman poured it from the white bowl into a plastic bag and later transferred it into a glass jar to be sent to the Mississippi Crime Lab for analysis.

¶3. During trial, Sheriff Huffman testified that the combination of heat and water cause the inert ingredients in the Vicks Inhaler to bond with water. The cotton swabs found within the inhaler are then placed in the liquid mixture. When the water eventually evaporates, a concentrated form of methamphetamine is squeezed from the cotton swabs using pliers. The result of this process is the formation of a narcotic substance commonly referred to as "kitchen crank", "bathtub meth", or "stove-top meth."

¶4. Grady Downy, a forensic scientist employed by the Mississippi Crime Lab, testified concerning the results reached by the lab after testing the liquid seized at the Studdard home. Methamphetamine was found in both the seized liquid and the cotton swabs. Downy explained that the active ingredient contained in the Vicks Inhaler, l-desoxyephedrine, is a form of methamphetamine. Each inhaler contains fifty (50) milligrams of l-desoxyephedrine combined with other ingredients. He further explained that the amount of l-desoxyephedrine found in the Vicks Inhaler is not changed by the process of boiling the contents in water. Rather, the amount of methamphetamine is simply concentrated when the other ingredients contained in the inhaler evaporate along with the water. The fifty (50) milligrams of l-desoxyephedrine found in each inhaler remains in the cotton swab(s) and may then be extracted in a condensed form.

## DISCUSSION OF THE ISSUES

**I. L-DESOXYEPHEDRINE IS A FORM OF METHAMPHETAMINE AND AS SUCH IS A SCHEDULE II CONTROLLED SUBSTANCE, THE MANUFACTURE OF WHICH IS PROHIBITED BY STATUTE.**

¶5. Although other state and federal courts have addressed the issue presented in the instant case, it now comes to Mississippi on first impression. After closely reviewing the position of other jurisdictions concerning this matter, we find the conclusion reached by other jurisdictions is proper. Therefore, it is our opinion that the lower court did not err in finding that the act of boiling Vicks Inhalers constitutes the illegal

manufacture of a Schedule II controlled substance.

¶6. Mississippi Code Annotated Section 41-29-115(c)(Supp. 1998) lists the following as Schedule II controlled substances: "[a]ny material, compound, mixture, or preparation which contains any quantity of the following substances: (1) Amphetamine, its salts, optical isomers, and salts of its optical isomers . . . " Further, any sale, manufacture, or possession of a schedule II controlled substance is prohibited by Miss. Code Ann. § 41-29-139 (Supp. 1998).

¶7. Crosswhite argues that the lower court was incorrect in labeling the act of boiling Vicks Inhalers as the manufacture of methamphetamine because l-desoxyephedrine is a form of methamphetamine which is exempt by statute in Mississippi. In support of his argument, he relies on Miss. Code Ann. § 41-29-122 (1993), which reads:

> Any material, compound, mixture or preparation which contains any quantity of a controlled substance and is listed as an exempt substance in 21 C.F.R., section 1308.22, shall be exempted from the provisions of the Uniform Controlled Substances Law.

Section 1308.22 of the Code of Federal Regulations excludes certain nonnarcotic products from the controlled substance list and designates for each product a company name, trade name, controlled substance contained therein, and the specific quantity of the controlled substance which may lawfully be present in the product. Both the "Vicks Inhaler" and "l-desoxyephedrine" are specifically descheduled by 21 C.F.R. § 1308.22.

¶8. Since the form of methamphetamine in Vicks Inhalers, l-desoxyephedrine, is exempt from controlled substance status and no statute states that the act of boiling the inhalers in water removes the product from its exempt status, Crosswhite argues that finding him guilty of a crime which is not defined by statutory law violates his due process rights. However, Crosswhite's argument is flawed because the substance formed after boiling the contents of a Vicks Inhaler in water is quite dissimilar from the substance sold over the counter as the Vicks Inhaler. Grady Downy, an expert in the field of forensic science, testified at trial that although the molecular composition of l-desoxyephedrine is not altered by boiling the substance in water, the small amount of l-desoxyephedrine contained in each Vicks Inhaler does not evaporate during the boiling process; thus, when many Vicks Inhalers are boiled the active ingredient is compounded and it is then possible to use a stronger concentration of l-desoxyephedrine at once than would have been possible through the use of the Vicks Inhaler. He further opined that the reason l-desoxyephedrine is exempt when contained in the isomer mix forming the Vicks Inhaler is the slight chance for abuse due to lack of potency.

¶9. In *United States v. Walker*, 960 F.2d 409 (5th Cir. 1992), the Fifth Circuit Court of Appeals addressed an argument which mirrors that asserted by Crosswhite. Relying on precedent established in *United States v. Martinez*, the Fifth Circuit ruled that the methamphetamine found in Vicks Inhalers is a regulated controlled substance, stating "[A]lthough the DEA descheduled . . . Vicks Inhaler, the DEA did not deschedule all forms of methamphetamine, and thus, 'methamphetamine is still properly classified as a schedule II controlled substance.'" *Walker*, 960 F.2d at 414 (*quoting United States v. Martinez*, 950 F.2d 222, 224 (5th Cir. 1991)). In so concluding, the Fifth Circuit expressly followed the decisions of the Eighth[1] and Ninth Circuits.

¶10. Regarding the exemption of Vicks Inhalers pursuant to 21 C.F.R. § 1308.22, the Ninth Circuit reasoned that "[t]he mere inclusion of a controlled substance [l-desoxyephedrine] as an ingredient in a

nonnarcotic nonprescription drug [Vicks Inhaler] does not alter its status under the Controlled Substances Act." *United States v. Durham*, 941 F.2d 886, 889-90 (9th Cir. 1991). Methamphetamine is properly categorized as a schedule II controlled substance regardless of whether it enjoys exemption from this status when combined with other ingredients to form a Vicks Inhaler. *Durham*, 941 F.2d at 889 (*citing United States v. Kendall*, 887 F.2d 240 (9th Cir. 1989); *United States v. Jones*, 852 F.2d 1235 (9th Cir. 1988)). The Ninth Circuit noted that there is no conflict in listing methamphetamine as a Schedule II controlled substance and excluding the same as a controlled substance when in the form of a Vicks Inhaler. *Id.* at 890. The statute prohibiting the possession or manufacture of methamphetamine and the federal regulation exempting methamphetamine when in the form of the Vicks Inhaler coexist, as each serves a distinct function. This is illustrated by the fact that a person in possession of a Vicks Inhaler could raise 21 C.F.R. § 1308.22 as a defense to a charge of possession of methamphetamine because the form of methamphetamine found in the Vicks Inhaler, when mixed with other ingredients in the inhaler, is exempt under § 1308.22. However, the possessor of methamphetamine such as that found in the cotton swabs after all other ingredients have evaporated is not shielded by the exemption provided to the Vicks Inhaler. After all, it is no longer a Vicks Inhaler in the person's possession. Accordingly, the Ninth Circuit concluded that the "proposed interpretation of the regulation is inconsistent with the structure of the statutory and administrative scheme and, therefore, must fail." *Id.*

¶11. The logic of federal and state courts which have analyzed the argument presented by Crosswhite is sound. Crosswhite did not possess the combination of ingredients which collectively form the Vicks Inhaler, but had reduced these ingredients into another form which is not exempted by 21 C.F.R. § 1308.22. The substance Crosswhite possessed is prohibited as a controlled substance by Miss. Code Ann. § 41-29-115(c). Therefore, due to the express statutory language prohibiting the production of a schedule II controlled substance, there is no need for a statute expressly prohibiting the boiling of such substances. No due process violation occurred in the present case.

## II. THE INTRODUCTION OF PRIOR BAD ACTS BY THE DEFENDANT AND SUBSEQUENT REFERENCE TO THESE ACTS DURING CLOSING ARGUMENT DID NOT DENY THE DEFENDANT A FAIR TRIAL.

¶12. The search of the Studdard home occurred on the night of September 22, 1995. Earlier that day, Dian Lavender, working in connection with the Metro Narcotics agency, purchased nearly one pound of marijuana from the Studdard home. During trial, the prosecution placed Dian Lavender on the witness stand to establish probable cause for the search warrant of the house. She testified that Crosswhite had previously told her he had "learned how to cook crystal from Vicks Inhalers." When asked how the conversation came about, Lavender answered, "It was just in conversation. I mean, I had used drugs with him."

¶13. Although defense counsel did not object at that moment, a motion for mistrial was made after the prosecution tendered the witness for cross-examination. The trial judge refused to declare a mistrial, but instructed the jury to disregard the comment regarding the defendant's past drug use and polled the jury to ensure that each juror would follow the instructions of the court.

### a. Admission of Prior Bad Acts.

¶14. The State argues Crosswhite did not contemporaneously object to the impermissible statement made by Lavender and thus the issue is procedurally barred on appeal. The law in Mississippi mandates that counsel must contemporaneously object to inadmissible evidence in order to preserve the error for appeal.

***Rushing v. State***, 711 So. 2d 450, 453 (Miss. 1998); ***Lester v. State***, 692 So. 2d 755, 795 (Miss. 1997). However, this rule is generally applied to situations in which no objection is made during trial and the issue is subsequently raised on appeal. Because defense counsel in the present case objected while the witness was still on the stand and fully argued to the trial judge the reasons for his objection, we find the issue of whether Lavender's comment constituted grounds for mistrial was adequately preserved for appeal.

¶15. Moreover, the trial judge properly refused to grant a mistrial following Lavender's testimony. It is a common occurrence for witnesses to "blurt out" impermissible evidence while testifying. Lay witnesses are not generally acquainted with the rules of evidence which safeguard against unduly prejudicing the defendant. It is true that in cases where impermissible testimony has reached the ears of the jury, the trial judge has the option of granting a motion for a mistrial if the judge feels the testimony is so prejudicial as to deny the defendant a fair trial. However, this Court has repeatedly held the trial judge may remedy such situation by admonishing the jury to disregard the statement. ***Snelson v. State***, 704 So. 2d 452, 456 (Miss. 1997)("This Court on numerous occasions has held that where the trial judge sustains an appellant's objection to the testimony of a witness and instructs the jury to disregard the same, prejudicial error does not result from that testimony."); ***McNeal v. State***, 658 So. 2d 1345, 1348 (Miss. 1995)("[W]here an objection to such impermissible testimony is sustained and the jury is admonished by the trial court to disregard the statement, this Court has repeatedly held that refusal to grant a mistrial is proper.") The trial judge in the instant case not only admonished the jury to disregard the impermissible statement but also polled the jury to ensure a fair trial. No juror claimed that he or she was unable to disregard the statement. The trial judge took appropriate measures to remedy the admission of Lavender's statement; consequently, we find no error in the denial of Crosswhite's motion for mistrial.

### b. Reference to Prior Bad Acts in Closing Argument

¶16. During closing arguments, defense counsel stated:

> Let me tell you what else. When Dian Lavender testified, Judge Montgomery had already instructed the lawyers to tell your witnesses don't talk about anything that is improper. Don't talk about other cases. Don't do that. Dian Lavender, she comes in and what does she do? Nobody asks her a question or anything. She said, 'Oh, I did drugs with Monte." Why is she doing that? She is wanting to make you think he is a bad person. She is wanting to avoid the judge's order. Now, I don't know whether she did it after the lawyers told her not to or I don't know whether they just didn't tell her not to. But whichever way it was done, it was wrong.

> \* \* \* \*

> [T]he prosecutor brings in somebody like Dian Lavender, whom they want to teach, anything to get yourself off, buddy. Say whatever you can to please the prosecutors to get yourself off. When she sat on the stand and said I'm going over to his house all the time but I'm not making sexual advances toward him, look at Monte. Look at her. Do you believe that is true? She says she's on speed and she's on cocaine and she is going over to his house all the time. She is not making any sexual advances, but she is here and reforming her life. If she is reforming it, she would have told the truth when she testified.

¶17. After defense counsel rested, the prosecution stated the following during its closing argument:

Then you're told [by defense counsel] that, well, she got on the witness stand, Dian Lavender, and she blurted out this business of drug use and other evidence that the State is trying to cook up things to get on Monte Crosswhite. That is more illegal State activities. It is shameful and you shouldn't do these things because it  once again, trying to get you to think about anybody other than Monte Crosswhite standing over that stove. Well, ladies and gentlemen, I rather suspect that the lady said what she did because she was telling the truth.

Defense counsel objected to the prosecution's representation that the witness was telling the truth. In response, the prosecution noted that defense counsel previously opened the door to comment concerning Dian Lavender during his closing argument. The trial judge overruled the objection and defense counsel now raises this issue claiming reversible error.

¶18. In *Foster v. State*, 639 So. 2d 1263, 1288 (Miss. 1994), this Court found no reversible error in the "bolstering" of the State's witness during closing argument. The prosecution's closing argument contained the following statements:

He . . . took the witness stand; he testified truthfully; he will get that reduced charge now no matter what. I'm bound by that. I am committed. So, yes, I believed him. I believed him enough to do that, and I still believe him.

*Id.* Regarding these statements, we found "[w]hen viewing the closing argument in its entirety, the brief reference to the statement can hardly be said to be error." *Foster*, 639 So. 2d at 1289.

¶19. Defense counsel asserts the District Attorney completely negated the trial judge's earlier admonishment to disregard the evidence when he mentioned Lavender's comment regarding prior drug use in his closing argument. However, defense counsel seems to have lost sight of the fact that he negated the admonishment first.

¶20. The prosecution responded to the attack on Lavender's credibility by stating "I rather suspect . . . she was telling the truth." The language used in this instance is not as persuasive as that used in *Foster*.

¶21. The present case is also distinguishable from *Tubb v. State* where we held a prosecutor's comments during closing argument as to the truthfulness of witnesses may constitute reversible error. *Tubb v. State*, 217 Miss. 741, 743-45, 64 So. 2d 911, 912-13 (1953). Unlike the facts presented in the present case, the district attorney in *Tubb* stated that he knew the witnesses testified truthfully due to the fact that he had personally investigated the case. Clearly a comment such as that in *Tubb* would prejudice the jury. The comment made by the prosecution in the instant case did not infer personal knowledge that Crosswhite had previously used drugs. Any prejudice resulting from the prosecutor's comment was invited by defense counsel and did not amount to the denial of a fair trial. Therefore, we find no reversible error in the ruling of the trial judge.

### III. THE TRIAL COURT DID NOT ERR IN ADMITTING AN ENVELOPE ON WHICH INGREDIENTS USED TO MANUFACTURE METHAMPHETAMINE WERE WRITTEN.

¶22. During the search of the Studdard house, police officers seized an envelope on which the words "ephedrine hydrochloride," "methamphetamine 65%", and "ritalin" were written. Officer Huffman testified that the envelope was found in the laundry room located in the downstairs level of the house. The

prosecution attempted to admit the envelope into evidence at that time, but defense counsel objected to the admission of the envelope due to its prejudicial nature. In response to counsels' arguments, the trial judge stated: "At this point I will let it be marked for identification. If it could be connected through other witnesses, I will let the State try to develop it. If not, I will consider excluding it."

¶23. Forensic scientist Grady Downy then testified that the ingredients listed on the envelope, specifically ephedrine HCL, could be used to manufacture methamphetamine. Over objection, the trial judge admitted the envelope into evidence. Crosswhite now asserts the admission of the envelope amounts to reversible error.

¶24. We find no reversible error. The envelope was properly admitted as pertaining to the knowledge of the defendant. During closing argument, defense counsel argued that Monte Crosswhite should not be found guilty of the manufacture of methamphetamine because he did not know that boiling Vicks Inhalers would produce a controlled form of methamphetamine. Knowledge is an essential element of the crime for which Crosswhite is charged, and the envelope tends to make the fact that Crosswhite knew he was manufacturing methamphetamine more probable. Miss. R. Evid. 401.

¶25. Further, the trial judge was correct in finding that the probative value of the envelope is not outweighed by its prejudicial effect. Miss. R. Evid. 403. The jury was informed that Monte Crosswhite was not in possession of the envelope when it was seized by the police. The testimony presented to the jury merely expressed the fact that the chemicals written on the envelope *could* be used to produce methamphetamine. The jury was left to draw its own conclusions from the testimony presented. Therefore, the prejudicial effect of the admission of the envelope was not so great as to constitute reversible error.

¶26. It is the responsibility of the jury to decide the amount of weight to be given to the evidence, but it is the responsibility of the judge to make the initial determination of relevancy. Miss. R. Evid. 104. Hence, pursuant to Miss. R. Evid. 401, the trial judge did not err in allowing the jury to consider the envelope as it is probative of the knowledge of the accused.

## CONCLUSION

¶27. Crosswhite's first assignment of error comes to this Court on first impression, but has been considered in federal courts and courts of other states. The logic of other jurisdictions regarding manufacture of methamphetamine by way of Vicks Inhalers is sound and is now adopted in Mississippi.

¶28. Following a close review of the record and applicable case law, we find the remainder of the issues are without merit. Monte Crosswhite received a fair trial and was convicted by a jury of his peers. Therefore, the ruling of the lower court is affirmed.

¶29. **CONVICTION OF THE MANUFACTURE OF METHAMPHETAMINE AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND PAYMENT OF A $5,000 FINE AFFIRMED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, SMITH AND WALLER, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**

1. See ***United States v. Roark***, 924 F.2d 1426 (8th Cir. 1991)(finding declassification of Vicks Inhalers by the FDA does not remove methamphetamine from classification as a schedule II controlled substance.) The Tenth Circuit, quoting ***United States v. Roark***, has also found that methamphetamine in the form of desoxyephedrine was not exempt from classification as a schedule II controlled substance due to the declassification of Vicks Inhalers. ***United States v. Youngblood***, 949 F.2d 1065 (10th Cir. 1991). This conclusion has also been reached by both the Supreme Court of North Dakota in ***State v. Erban***, 429 N.W.2d 408 (N.D. 1988) as well as the United States District Court for Hawaii in ***United States v. Viernes***, 763 F.Supp. 1068 (D. Haw. 1991).