## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-00149-SCT

*ELLIS SPANN, III*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/14/98 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JEFFREY L. HALL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | E. LINDSAY CARTER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED-08/24/2000 |
| MOTION FOR REHEARING FILED: | 9/7/2000; denied 12/7/2000 |
| MANDATE ISSUED: | 12/14/2000 |

**BEFORE PRATHER, C.J., SMITH AND DIAZ, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. Ellis Spann, III was convicted in the Circuit Court of Forrest County, Mississippi, of aggravated assault and capital murder. On the count of aggravated assault, Spann was sentenced to serve twenty years in custody of the Mississippi Department of Corrections, to run consecutively with a sentence of life imprisonment without parole on the count of capital murder. Spann has appealed his conviction to this Court.

### STATEMENT OF FACTS

¶2. At 8:30 p.m. on July 29, 1997, Ellis Spann III ("Spann"), nineteen years old, and Jerrian Horne ("Horne"), fourteen years old, entered Uncle Guy's Quick Stop in Hattiesburg, Mississippi. Spann was armed with a .38 caliber revolver, and Horne with a .22 caliber rifle. The third member of the trio, Terry McLaurin ("McLaurin"), remained outside the store. Myong Ja Son (commonly referred to as "Ms. Su"), an employee of the Quick Stop, and her brother, Myong Cheon Son ("Son"), were behind the counter watching television. Both Ms. Su and Son were shot. Ms. Su, who was shot in the wrist and in the chest, survived her injuries. Son was killed by a gunshot wound to his head. A bullet also grazed his right shoulder. Spann, Horne, and McLaurin fled the scene immediately. The crime was recorded by a video surveillance camera located behind the counter.

¶3. On December 2, 1997, the grand jury of Forrest County, Mississippi, returned an indictment charging Spann, Horne, and McLaurin with aggravated assault and capital murder. Forrest County Circuit Court Judge Richard W. McKenzie granted Spann's request that his trial be severed from that of Horne and McLaurin. On November 23, 1998, the circuit court granted the State's motion to amend the indictment to correct a scrivener's error in Count II of the indictment. The original indictment alleged that the underlying felony for the capital murder charge was the crime of robbery, committed in violation of Miss. Code Ann. § 97-3-73 (1994). The indictment was amended to reflect that the underlying felony was the crime of armed robbery, committed in violation of Miss. Code Ann. § 97-3-79 (Rev. 1994).

¶4. At trial, Ms. Su testified that she recognized Horne and Spann, who regularly came into the store. She stated that on the day of the crime, they came into the store three or four times. In court, Ms. Su identified Spann as the man who shot her. Officers of the Hattiesburg Police Department interviewed Ms. Su at the hospital, and she gave them a description of Horne, a black male with red hair and blue eyes. She told them where Horne lived.

¶5. Upon arriving at Horne's residence, Lieutenant Charles DeJarnett found Horne, who told DeJarnett that he had been at a friend's house on Claiborne Avenue that evening. Officers went to the house on Claiborne Avenue, the home of Essie Ellis ("Ellis"), where they retrieved the .22 rifle from beneath the house. Ellis testified that her nephews, Terry McLaurin and Tony McLaurin, were living with her at the time. She stated that on the day of the crime, Horne and Spann were at the house visiting the McLaurin boys. She stated that Spann lived with his grandmother across from the Ellis house. Ellis testified that between 8 p.m. and 9 p.m. the evening of the crime, she heard a noise outside. She stated that she had corrugated metal around the house and heard it rattling. She stated that she went to the bathroom window and asked who was there. She testified that Horne identified himself and said he was "taking a pee" and had knocked the metal down. Behind the metal, police officers recovered the .22 rifle. Ellis testified that the following day, police officers returned to the house, and Ellis signed a written consent form for search of the house. Under a bed in the house, the officers recovered the .38 revolver.

¶6. Horne and McLaurin were taken into custody. Warrants were issued for the arrest of Spann, who could not be located the evening of the crime. Spann's father brought Spann to the police station the following afternoon. Detective Rusty Keyes interviewed Spann at the police station. Keyes stated that before talking to Spann, he read Spann his *Miranda* rights and waiver, which Spann signed. Spann's statement reads as follows:

Q: Do you know anything about the robbery and shooting that occurred at Uncle Guy's Quick Stop on July 29, 1997, located at 1021 Edwards Street?

A: Yes.

Q: In your own words, please tell Detective Rusty Keyes what you know.

A: At about 8:30, me, Ba-Ba and Fatso[1] walked to the store. Ba-Ba went into the store first, and I came in behind him. After he walked from me, he walked to the old man, then Ms. Su started screaming and hollering, and Ba-Ba and I shot. Then Ba-Ba took off running and I took off running. Then I left out of the store and went home and changed clothes. I then left and went to the country and came back this morning.

Q: Why did the three of you go to the store?

A: We were going to get cigarettes, and Ba-Ba said that he was going to rob the store.

Q: Who gave you the revolver that was used in the shooting

A: I got the gun from Ba-Ba while walking to the store. He had the rifle in his pants.

Q: Where is the gun at this time?

A: I left the gun on Fatso's porch, and I left and went home.

....

Q: How many shots did you fire inside the store?

A: Probably two.

Q: Who did you shoot in the store?

A: Ms. Su and no one else.

Spann's motion to suppress his statement was denied by the trial court. The defense rested at the close of the State's case-in-chief.

¶7. The jury found Spann guilty of aggravated assault and capital murder and found that Spann should be sentenced to life imprisonment without parole for the crime of capital murder. On December 14, 1998, the circuit court sentenced Spann to serve a term of twenty years for aggravated assault, to run consecutively with the life sentence.

¶8. On December 21, 1998, Spann filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial. The circuit court denied the motions on January 15, 1999. On January 22, 1999, Spann filed a notice of appeal. He raises the following contentions:

**I. THE TRIAL COURT ERRED IN FAILING TO GRANT A MISTRIAL.**

**II. THE TRIAL COURT ERRED IN DENYING SPANN'S MOTIONS FOR DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT.**

**III. THE TRIAL COURT ERRED IN FAILING TO GIVE A PEREMPTORY INSTRUCTION TO THE JURY REQUIRING THEM TO RETURN A VERDICT OF "NOT GUILTY."**

**IV. THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE, AND THE VERDICT EVIDENCED BIAS AND PREJUDICE AGAINST SPANN.**

**V. THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE A PROJECTILE WITHOUT ESTABLISHING THE PROPER CHAIN OF CUSTODY.**

**VI. THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE CRIME SCENE**

**PHOTOGRAPHS.**

**VII. THE TRIAL COURT ERRED IN ALLOWING THE MANIPULATION OF THE SURVEILLANCE TAPE.**

**VIII. THE TRIAL COURT ERRED IN ALLOWING THE STATE TO AMEND THE INDICTMENT.**

**IX. THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE SPANN'S CONFESSION.**

**X. THE TRIAL COURT ERRED IN FAILING TO GRANT SPANN'S JURY INSTRUCTION REGARDING THE AGE OF HORNE AND HIS ELIGIBILITY TO RECEIVE THE DEATH PENALTY AND IN PROHIBITING DEFENSE COUNSEL FROM ARGUING THAT HORNE WAS INELIGIBLE TO RECEIVE THE DEATH PENALTY.**

**XI. THE STATE'S EXERCISE OF PEREMPTORY STRIKES VIOLATES *BATSON V. KENTUCKY*.**

**DISCUSSION OF LAW**

### I. THE TRIAL COURT ERRED IN FAILING TO GRANT A MISTRIAL.

¶9. Spann argues that the trial court committed reversible error in refusing to grant a mistrial during Ms. Su's testimony. The applicable standard of review for denial of a motion for mistrial is abuse of discretion. *McGilberry v. State*, 741 So. 2d 894, 907 (Miss. 1999).

¶10. Ms. Su, who speaks only broken English, testified with the aid of an interpreter. On direct examination by the State, while the State was attempting to lay a foundation to support an in-court identification of Spann by Ms. Su, Ms. Su, apparently in an emotional state, pointed at Spann. The court instructed the jury to leave the courtroom, at which time the State proffered the testimony of Ms. Su. During the proffer, Ms. Su again pointed in Spann's direction. Because Ms. Su was having difficulty describing the person to whom she was pointing, the trial judge allowed Ms. Su, outside the presence of the jury only, to walk over to Spann and point him out. The trial judge explained that he did not want Ms. Su to walk over to Spann in the presence of the jury, but stated that because the jury was out, "if she identifies him to my satisfaction outside the presence of the jury, then I don't have any objection to her at the appropriate time pointing to the defendant and saying what he's got on if, in fact, she has identified him." The trial judge explained that, based upon Ms. Su's identification of Spann on proffer, he would allow her to identify Spann in open court, but told the prosecutor that Ms. Su was not to leave the witness stand and that she must not point to Spann until the prosecutor asked Ms. Su if she could identify Spann. The interpreter explained this to Ms. Su. At that time, defense counsel moved for a mistrial. The judge denied the request, and, upon the jury's return to the courtroom, issued a precautionary instruction:

> I'm going to instruct you at this particular time that any previous or prior gestures made by this witness, i.e. the same as pointing in any direction, should be totally disregarded by you as a jury and would be of no evidentiary value.

The prosecutor then laid the appropriate foundation for Ms. Su's identification of Spann, following which the prosecutor asked Ms. Su whether she saw in the courtroom the man who shot her. Ms. Su then pointed Spann out and described his clothing.

¶11. Spann argues that the precautionary instruction was not enough to rectify the prejudicial nature of Ms. Su's testimony. Spann relies on *Goggins v. State*, 529 So. 2d 649 (Miss. 1988). In *Goggins*, a witness identified the defendant during a pre-trial lineup. During the identification suppression hearing and outside the presence of the jury, the witness was permitted, over defense counsel's objection, to leave the stand to make a dramatic identification of the defendant. The trial judge permitted the witness to do the same in the presence of the jury. This Court held that the reenactment of the witness' original in-court identification of the defendant was cumulative and possibly prejudicial, requiring reversal. *Id.* at 654.

¶12. *Goggins* is not persuasive in the case at hand. As the State submits, the trial judge in *Goggins* overruled the objection to the witness' demonstration, and no admonishment was given by the trial judge. Furthermore, the witness in *Goggins* left the witness stand and walked over toward the defendant to make an dramatic identification. Though Ms. Su left the witness stand to do the same in the case at hand, she did so only outside the presence of the jury. Once the jury had returned and the trial judge had instructed the jury to disregard any prior gestures made by Ms. Su, Ms. Su made an admissible in-court identification of Spann by gesturing only at the appropriate time and without leaving her seat. Also, there was no prior identification by Ms. Su of Spann as the man who shot her. Thus, the in-court identification in the case at hand was not cumulative.

¶13. The State contends that the remedial measures taken by the trial judge in the case sub judice were sufficient to preclude any harm flowing from Ms. Su's initial gesturing. This Court has stated that where an objection is sustained and the jury is admonished to disregard the objectionable matter, absent unusual circumstances, this Court will find no error. *Wright v. State*, 540 So. 2d 1, 4 (Miss. 1989) (citing *Wetz v. State*, 503 So.2d 803, 810 (Miss.1987); *May v. State*, 460 So.2d 778, 783 (Miss.1984); *Herron v. State*, 287 So.2d 759, 766 (Miss.1974)). The State submits that Ms. Su's spontaneous gesturing is analogous to the outburst analyzed in *Crosswhite v. State*, 732 So. 2d 856 (Miss. 1998). Crosswhite was convicted of manufacturing a controlled substance. On appeal, Crosswhite argued that the trial court erred in refusing to grant his request for a mistrial when a witness, who was on the stand to establish probable cause for the search warrant of the house, spontaneously stated she had used drugs with Crosswhite. As in the case at hand, the jury was instructed to disregard the comment. In analyzing the assignment of error, this Court stated:

> It is a common occurrence for witnesses to "blurt out" impermissible evidence while testifying. Lay witnesses are not generally acquainted with the rules of evidence which safeguard against unduly prejudicing the defendant. It is true that in cases where impermissible testimony has reached the ears of the jury, the trial judge has the option of granting a motion for a mistrial if the judge feels the testimony is so prejudicial as to deny the defendant a fair trial. However, this Court has repeatedly held the trial judge may remedy such situation by admonishing the jury to disregard the statement.

*Id.* at 861 (citing *Snelson v. State*, 704 So. 2d 452, 456 (Miss.1997) ("This Court on numerous occasions has held that where the trial judge sustains an appellant's objection to the testimony of a witness and instructs the jury to disregard the same, prejudicial error does not result from that testimony."); *McNeal v. State*, 658 So. 2d 1345, 1348 (Miss.1995) ("[W]here an objection to such impermissible testimony is

sustained and the jury is admonished by the trial court to disregard the statement, this Court has repeatedly held that refusal to grant a mistrial is proper.")).

¶14. The in-court identification in the case at hand was probative, and any prejudice caused by Ms. Su's initial gestures toward the defendant was cured by the judge's cautionary instruction. Spann's first assignment of error is without merit.

**II. THE TRIAL COURT ERRED DENYING SPANN'S MOTIONS FOR DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT.**

**III. THE TRIAL COURT ERRED IN FAILING TO GIVE A PEREMPTORY INSTRUCTION TO THE JURY REQUIRING THEM TO RETURN A VERDICT OF "NOT GUILTY."**

¶15. Spann's motion for directed verdict made at the end of the case for the prosecution, the request for a peremptory instruction at the end of all of the evidence, and, finally, his motion for judgment of acquittal notwithstanding the verdict all are procedural vehicles for challenging the sufficiency of the case for the prosecution. *Wetz v. State*, 503 So. 2d 803, 807-08 n.3 (Miss. 1987). As this Court explained in *Wetz*, "when the sufficiency of the evidence is challenged on appeal, this Court properly should review the circuit court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Id.* at 808 n.3. In this case, that was when the circuit court denied Spann's motion for judgment notwithstanding the verdict. Thus, Spann's second and third assignments of error are here properly considered together.

¶16. In considering the sufficiency of the evidence supporting the verdict, this Court will consider all of the evidence in the light most favorable to the verdict. *Id.* at 808 (citing *Harveston v. State*, 493 So. 2d 365, 370 (Miss.1986); *Callahan v. State*, 419 So. 2d 165, 174 (Miss.1982); *Sadler v. State*, 407 So. 2d 95, 97 (Miss.1981)). Credible evidence which is consistent with the guilty verdict must be accepted as true. *Id.* (citing *Spikes v. State*, 302 So. 2d 250, 251 (Miss.1974)). The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Id.* (citing *Hammond v. State*, 465 So. 2d 1031, 1035 (Miss.1985); *May v. State*, 460 So. 2d at 781; *Glass v. State*, 278 So. 2d 384, 386 (Miss.1973)). Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. *Id.* (citing *Neal v. State*, 451 So. 2d 743, 758 (Miss. 1984); *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980)). This Court may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. *Id.* (citing *Harveston v. State*, 493 So. 2d at 370; *Fisher v. State*, 481 So. 2d 203, 212 (Miss. 1985)).

¶17. The heart of Spann's attack on the jury's verdict is his claim that the prosecution failed to prove the underlying felony necessary to make the crime of murder a capital crime. The indictment originally charged Spann with the underlying crime of robbery in violation of Miss. Code Ann. § 97-3-73 (Rev.1994). However, the indictment was later amended to reflect that the crime of robbery was committed in violation of Miss. Code Ann. § 97-3-79 (Rev. 1994). To be convicted of armed robbery in violation of § 97-3-79, one must "feloniously take or **attempt to take** from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." (emphasis added). It is undisputed that there was no evidence that either Spann, Horne, or McLaurin actually removed property from Uncle Guy's Quick Stop.

The argument lies in whether the State demonstrated that Spann, Horne, or McLaurin attempted to take property from the Quick Stop.

¶18. Spann contends that the State offered no evidence that the crime was an attempt to deprive the Quick Stop of property. This contention is erroneous. The State offered into evidence the statement given by Spann to the Hattiesburg Police in which Spann stated as follows:

> Q: Why did the three of you go to the store?
>
> A: We were going to get cigarettes, and Ba-Ba said that he was going to rob the store.
>
> Q: Who gave you the revolver that was used in the shooting?
>
> A: I got the gun from Ba-Ba while walking to the store.

It is well settled in Mississippi that an attempt to commit a crime consists of three elements: (1) an intent to commit a particular crime; (2) a direct ineffectual act done toward its commission; and (3) the failure to consummate its commission. *Greenwood v. State*, 744 So. 2d 767, 769 (Miss. 1999) (citing *Edwards v. State*, 500 So. 2d 967, 969 (Miss.1986); *Bucklew v. State*, 206 So. 2d 200, 202 (Miss. 1968)). Regarding Spann's intent to commit armed robbery, Spann stated in his confession to police that Horne told him he was going to rob the store. Spann then accepted a gun from Horne and participated in the crime. Regarding the overt act towards the commission of the crime, Spann and Horne entered the store with their faces masked and brandishing the weapons.

¶19. The State argues that *Greenwood v. State*, 744 So. 2d 767 (Miss. 1999), is similar to the case at hand. Greenwood was convicted of attempted armed robbery. On appeal, he argued that the evidence presented by the State did not support a conviction of attempted armed robbery. A witness for the State testified that Greenwood told him that he was thinking about robbing the victim. The witness also testified that Greenwood told him that he had planned to knock on the victim's door and hold a pistol to his head once he opened the door. Greenwood did not, however, go through with the plan to hold a gun to the victim's head, but instead asked the victim for gasoline when he opened the door. The State also introduced Greenwood's voluntary statement in which he admitted to shooting the victim through a window and throwing a rock through the door of the victim's house. The Court found that although Greenwood did not carry out the initial plan to hold the gun to the victim's head and rob him, his actions of shooting the victim and throwing the concrete block were clearly sufficient overt acts to support his conviction for attempted armed robbery. The Court noted that the jury was free to infer that the only reason no robbery was consummated was because the victim returned gunfire, causing Greenwood and his cohorts to flee.

¶20. In the case at hand, the State introduced Spann's confession that on the way to the store, Horne stated that he intended to rob the store. Spann accepted the revolver from Horne, masked his face, and walked into the store wielding the revolver. As in *Greenwood*, though Spann, Horne, and McLaurin did not carry out the initial plan to rob the Quick Stop, their actions of entering the store with weapons, faces masked, and shooting Son and Ms. Su were clearly sufficient overt acts to support the underlying felony of armed robbery. The jury was free to infer that the plan to commit the robbery broke down when Ms. Su recognized Spann and Horne, despite their masked faces. The State also presented the testimony of Bud Witherspoon that Spann, Horne, and McLaurin fled the store as Witherspoon approached. As in *Greenwood*, the jury was also free to infer that the only reason no robbery was consummated was that

Witherspoon entered the parking lot, causing Spann and his cohorts to flee. Considering all of the evidence in the light most favorable to the verdict, it cannot be said that reasonable and fair minded jurors could not find that Spann had attempted to commit the underlying felony of armed robbery.

### IV. THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE, AND THE VERDICT EVIDENCED BIAS AND PREJUDICE AGAINST SPANN.

¶21. Spann argues that the overwhelming weight of the evidence demonstrated that he could not be guilty of capital murder because there was no evidence of an underlying felony as required by Miss. Code Ann. § 97-3-19(2)(e). Again, § 97-3-19(2)(e) elevates the crime of murder to capital murder when the killing occurs during the commission of, as is pertinent in this case, a robbery or attempt to commit a robbery.

¶22. "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997) (citing *Thornhill v. State*, 561 So. 2d 1025, 1030 (Miss. 1989)). This Court must accept as true the evidence favorable to the State. *Wetz v. State*, 503 So. 2d at 812 (citing *Van Buren v. State*, 498 So. 2d 1224, 1228 (Miss. 1986)).

¶23. There was no evidence offered at trial that Spann, Horne, or McLaurin actually took property from the Quick Stop. However, as discussed previously, the State offered into evidence the statement given by Spann to Hattiesburg Police, in which Spann stated that Horne said he was going to rob the store. Spann also stated that he then accepted a weapon from Horne. The two donned masks and entered the store. As discussed above, this evidence supports the jury's determination that Spann violated Miss. Code Ann. § 97-3-79, which provides:

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery....

Spann offered absolutely no evidence which conflicts with his statement to police. In light of our standard of review, this assignment of error is without merit.

### V. THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE A PROJECTILE WITHOUT ESTABLISHING THE PROPER CHAIN OF CUSTODY.

¶24. Spann argues that the trial court erred in allowing into evidence a projectile when the evidence custodian of the Hattiesburg Police Department, Officer Buffington, did not testify as to his receipt and logging in of the evidence. The admissibility of evidence rests within the discretion of the trial court. *Sturdivant v. State*, 745 So. 2d 240, 243 (Miss. 1999) (citing *Baine v. State*, 606 So. 2d 1076, 1078 (Miss.1992); *Wade v. State*, 583 So. 2d 965, 967 (Miss.1991)). Spann contends that the missing link in the chain of custody is sufficient to warrant this Court's holding that the trial court abused its discretion in allowing the projectile into evidence.

¶25. The projectile in question is the bullet taken from Ms. Su's chest. The chain of custody for it is as follows. The projectile was removed from Ms. Su at the Surgery Clinic of Hattiesburg. Officer Traxler of

the Hattiesburg Police Department retrieved the projectile from the Surgery Clinic and transported it to the evidence locker at the Hattiesburg Police Department. There the evidence was received by the evidence custodian, Officer Buffington. Officer Jeff Byrd took the projectile to the Mississippi Crime Lab. Starks Hathcock, an employee of the Mississippi Crime Lab, received the projectile at the Crime Lab and, subsequent to testing the projectile, returned the projectile to the vault, where it was retrieved by Officer Byrd. The State offered the testimony of the attending nurse from the Surgery Clinic, Traxler, Byrd, and Hathcock. The State did not offer the testimony of Buffington. When the State attempted to introduce the projectile into evidence via the testimony of Hathcock, defense counsel objected on the basis that the State had not offered the testimony of Buffington. The following exchange took place:

> THE COURT: What's the basis of your objection?
>
> MR. RATLIFF [for Spann]: When Mr. Byrd testified yesterday, he identified another person who had custody of that exhibit, who they have not brought to court to complete the chain.
>
> THE COURT: Now, who would that be?
>
> MR. RATLIFF: Officer Buffington. Mr. Buffington.
>
> MR. JONES [for the State]: If the Court please, we don't have to bring every individual. I didn't hear Officer Traxler testify, but I believe he delivered it to the evidence custodian there at that particular time, Mr. Buffington. I mean, we can bring him if we're required to bring him up here, but -
>
> [Jury is dismissed.]
>
> MR. RATLIFF: Your Honor, yesterday in his testimony, Mr. Byrd testified specifically as to the exhibit that we're dealing with right now, which is No. 12, that that particular exhibit at some point went into the custody of Mr. Buffington at the Police Department, and we submit that without his testimony the State cannot complete the chain of custody, cannot make all the links in the chain, and for that reason we object to the introduction of that exhibit at this time.

¶26. The trial judge noted that the State is not required to offer the testimony of every person who handled the projectile and overruled Spann's objection, stating that "without the contention in this record of any tampering or alteration of that evidence, the Court would rule that that is merely one administrative step since [Officer Buffington] is just the custodian of it...." Defense counsel stated that it was not prepared to put on evidence of any tampering. The trial judge appropriately relied upon this Court's decision in *Ormond v. State*, 599 So. 2d 951 (Miss. 1992), in ruling that absent Spann's contention of tampering or alteration of the projectile, the State had satisfied the rule of evidence governing the requirement of authentication or identification that the "condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Miss. R. Evid. 901(a). In *Ormond*, this Court explained:

> The advent of the current rules of evidence has not changed the rule that "the proponent must satisfy the trial court that there is no reasonable inference of material tampering with or (deliberate or accidental) substitution of the evidence"; this state's law has never required a proponent of evidence to produce every handler of the evidence. *Butler v. State*, 592 So. 2d 983, 985 (Miss.1991). This case presents no evidence of alteration or substitution or tampering with the [evidence] at any time. Under the abuse-of-discretion standard, although the chain may not have been thoroughly

demonstrated, in the absence of any contention of alteration or tampering, the trial court did not abuse its discretion in admitting the [evidence].

*Ormond,* 599 So. 2d at 959. The test of whether there has been a break in the chain of custody of evidence is whether there is an indication or reasonable inference of probable tampering with the evidence or substitution of the evidence. *Nalls v. State*, 651 So. 2d 1074, 1077 (Miss. 1995) (citing *Gibson v. State*, 503 So. 2d 230, 234 (Miss. 1987); *Nix v. State*, 276 So. 2d 652, 653 (Miss. 1973)).

¶27. In examining the record, this Court finds no indication that the projectile entered into evidence had been tampered with, and as such, there was no break in the chain of custody. Though the chain was not thoroughly demonstrated, the State clearly offered sufficient evidence, under the abuse of discretion standard, that the projectile in question is what the State claimed it is -- that is, the projectile removed from Ms. Su. This assignment of error is without merit.

## VI. THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE CRIME SCENE PHOTOGRAPHS.

¶28. Spann argues that certain photographs offered into evidence by the State should have been excluded by the trial court because their prejudicial effect outweighs their probative value. Specifically, the color photographs objected to by Spann and admitted into evidence include three autopsy photographs of Son, one depicting the bullet wound to his head, and two depicting the graze wound on his shoulder; and four photographs of Son taken in the store while Son's body was still seated in the chair in which he was sitting when he was shot There were three photographs of Son's body from the crime scene which were withdrawn by the State prior to being admitted into evidence. The State counters that the photographs had probative value in that they aided in demonstrating to the jury the crime scene and Son's injuries. The State also argues that the photographs show Son as he was found at the location of the murder, thus corroborating the testimony of the officers who investigated the crime scene.

¶29. The admissibility of photographs rests within the sound discretion of the trial judge and will not be disturbed absent a showing of an abuse of discretion. *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995); *Jackson v. State*, 527 So. 2d 654, 657 (Miss. 1988); *Alford v. State*, 508 So. 2d 1039, 1041 (Miss. 1987). The discretion of the trial judge "runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987). *See also Westbrook v. State*, 658 So. 2d at 849; *Hart v. State*, 637 So. 2d 1329, 1335 (Miss. 1994).

¶30. Arguing that the admission of the photographs was reversible error, Spann relies on *Davis v. State*, 551 So. 2d 165, 173 (Miss. 1989), where this Court stated that "photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established." (citing *Sharp v. State*, 446 So. 2d 1008, 1009 (Miss. 1984); *Shearer v. State*, 423 So. 2d 824, 827 (Miss. 1982)). Spann asserts that because he stipulated to the method of Son's death, the identity of Son, and also that the fatal shot came from the gun carried by Horne, the photographs contained no probative value.

¶31. "The mere fact that a photograph may arouse the emotions of jurors does not render it incompetent so long as the photograph serves a legitimate evidentiary purpose." *Sharp,* 446 So. 2d at 1009 (citing *May v. State*, 199 So. 2d 635, 640 (Miss. 1967)). Photographs have evidentiary value when they: (1) "aid in

describing the circumstances of the killing; (2) describe the location of the body and cause of death; (3) supplement or clarify witness testimony." ***Westbrook***, 658 So. 2d at 849 (citations omitted). In ***Miller v. State***, 740 So. 2d 858 (Miss. 1999), this Court held that the trial court did not err by allowing the State to introduce a picture of the victim's body at the crime scene even though there was no dispute as to the cause of death, the place and time of death, the name of the decedent, and at whose hands she died. ***Id.*** at 865. The Court noted in ***Miller*** that the photographs were probative of the distance from which the victim was shot and how the shooting occurred. ***Id.***

¶32. Likewise, the photographs here were probative as well. The autopsy photographs of Son's wounds were offered into evidence during the testimony of Dr. Stephen Hayne, the forensic pathologist who performed the autopsy. Dr. Hayne testified regarding the wounds received by Son. The autopsy photographs, though unpleasant but not particularly gruesome, aided in Dr. Hayne's testimony regarding the types of wounds received by Son and the locations of the wounds. The photographs of Son from the crime scene corroborated the testimony of Officer Byrd regarding the graze wound to Son's shoulder. They also corroborated the testimony of other officers regarding the scene of the crime at the time of his arrival and the position of the victim. Though it was undisputed by the parties that the fatal shot was shot by Horne, the defense disputed at trial that Spann had fired a shot at Son, grazing Son on the shoulder. The photographs depict the position of Son in which he was shot, as well as the graze wound. The photographs also display the shelves behind Son where the projectile which caused the graze wound was found, and they are helpful in understanding the direction from which the wound was likely received. Thus, the photographs had probative value, and the trial court did not abuse its discretion in admitting the photographs.

¶33. Spann argues that this Court should reach the same result as it did in ***Welch v. State***, 566 So. 2d 680 (Miss. 1990). In ***Welch***, the Court found that autopsy photographs of a dissected cadaver lacked probative value. ***Id.*** at 685. The photographs showed the cadaver cut open in a Y-shape manner with the ribcage refracted back over the face of the victim, the anterior part of the thoracic cavity, the ribs and the sternum, the ribs removed from the body, the abdominal walls including the intestines which had been opened up, and organs that had been removed from the cadaver. The Court determined that the photographs were impermissibly admitted in that they failed to demonstrate the circumstances surrounding the victim's death, the cruelty of the crime, the location of the wounds, nor the extent and violence used. ***Id.***

¶34. ***Welch*** is distinguishable on its facts. As discussed above, the photographs of Son had probative value. Although the photographs are unpleasant, they do not appear to be as gruesome as some photographs described in other cases. Spann offers no explanation of how his defense was prejudiced by the admission of the photographs. This assignment of error is without merit.

### VII. THE TRIAL COURT ERRED IN ALLOWING THE MANIPULATION OF THE SURVEILLANCE TAPE.

¶35. The State utilized the store's video surveillance tape at trial during the testimony of Detective Rusty Keyes. The State asked Keyes, while the tape was played, to explain to the jury how he used the tape in his investigation. In doing so, Keyes was permitted to stop and start the tape and to rewind the tape as he described the actions of the suspects and the victims. Spann does not dispute that the videotape would have been admissible as a fair representation of the crime had it been played at a normal speed from start to finish, nor does Spann dispute that the video had probative value. Rather, Spann contends that the manipulation of the videotape by Keyes created an unreal depiction of the scene which unfairly prejudiced

Spann.

¶36. As with the admission of photographs, the admissibility of a videotape rests within the sound discretion of the trial judge. *McFee v. State*, 511 So. 2d 130, 134 (Miss. 1987) (citing *Watson v. State*, 483 So. 2d 1326, 1328 (Miss. 1986); *Kelly v. State*, 463 So. 2d 1070, 1074 (Miss. 1985); *Stevens v. State*, 458 So. 2d 726, 729 (Miss. 1984); *Sharp v. State*, 446 So. 2d at 1009. Likewise, the same standard of admissibility which applies to photographs, discussed supra, also applies to videotapes. *McGilberry*, 741 So. 2d at 906 (citing *Holland v. State*, 587 So. 2d 848, 864 (Miss. 1991)). Accordingly, this Court must determine if the probative value of the video, particularly in light of Keyes's manipulation of its speed and direction, outweighs any prejudicial effect it might cause. *Berry v. State*, 703 So. 2d 269, 278 (Miss. 1997).

¶37. The videotape, though certainly prejudicial to Spann's case, had substantial probative value in that it aided in describing the circumstances of the crime and it supplemented and clarified witness testimony. *See Westbrook*, 658 So.2d at 849. The probative value of the tape was in fact increased by the court's allowing Keyes to stop the tape in order to describe the actions of the suspects and victims. He was permitted, by manipulating the speed of the tape, to juxtapose his description of the crime scene with information regarding the police department's investigation, which ultimately led to the trial of the defendant. During his explanation of the tape and his investigation, Keyes did not refer to any of the suspects by name, but referred to them only as Suspects No. 1, 2, and 3. The videotape, plus Keyes's explanations, helped to clarify prior evidence regarding the actions of the suspects and victims, most of which was confusingly intertwined with testimony regarding ballistics. Keyes's testimony and manipulation of the tape illustrated the crime better than mere oral testimony or drawings could, particularly in light of the fact that it was disputed at trial as to who fired what bullet in what direction. The tape, only seventeen seconds long in real time, would have been difficult to explain had it been played in real time, particularly when the suspects and victims were acting simultaneously. In dispute at trial were the number of times Spann fired his weapon and at whom he fired. Keyes's explanation of the suspects' actions relative to the location of the victims was helpful in this regard as well.

¶38. Spann contends that Keyes's manipulation of the videotape created an unreal depiction of the crime scene. Spann compares Keyes's presentation of the videotape to cases in which this Court has held that staged photographs which did not fairly depict the scene are inadmissible. *See May v. State*, 199 So. 2d 635 (Miss. 1967); *Martin v. State*, 217 Miss. 506, 64 So. 2d 629 (1953); *Brett v. State*, 94 Miss. 669, 47 So. 781 (1908); *Fore v. State*, 75 Miss. 727, 23 So. 710 (1898). In *May*, the trial court allowed into evidence a photograph showing a probe pointing to a bullet hole in the nude body of the deceased. This arrangement of objects in the photograph was for the purpose of indicating the path of the bullet as it passed through the body of the deceased. The Court noted that the arrangement of the probe in the photograph was evidence of the person making the arrangement, and was an effort to get the photograph to testify as evidence in its own right. *May*, 199 So.2d at 693. The Court held that such was inadmissible as evidence. However, the Court went on to state, "This does not mean that a witness cannot point to places and things shown on a true photograph, and mark them, if necessary, so as to make the testimony of the witness clearer to the jury." *Id.* (citing *Sims v. State*, 209 Miss. 545, 47 So. 2d 849 (1950)). Rather, it only means that "a photographer cannot set up a scene, as pointed out by others, and photograph such an arrangement so as to indicate evidence drawn from deductions and conclusions of others." *Id.*

¶39. In the case at hand, the tape was in no way manipulated to alter images, and neither was it altered with

editing techniques. It cannot be said that the videotape, even as it was presented during Keyes's testimony, did not depict an accurate representation of what occurred at the crime scene. The scene was in no way set up as it was in *May*, and the fact that Keyes stopped and rewound the tape did not alter the depiction of events as they actually occurred. Neither are the other cases cited by Spann persuasive. In *Martin*, just prior to the defendant's trial, the sheriff went to the crime scene and made photographs showing the sheriff standing in the place where the defendant allegedly stood at the time of the shooting and showing the county attorney standing in the place of the deceased at the time he was shot. In *Brett*, this Court held inadmissible a photograph of the chief witnesses for the prosecution, representing them in the position from which they claimed to have seen the homicide, the photographer standing where they claimed defendant was when he shot. *Brett*, 47 So. at 782. In *Fore*, this Court held inadmissible photographs taken by a witness for the State in which the witness had placed a buggy, with a man in it, in the position in which the victim was when the victim was shot. *Fore*, 23 So. at 712. Clearly, these photographs differ from the videotape introduced in the case at hand. The fact that Keyes manipulated the speed of the videotape as he testified does not alter the actions of the suspects or victims at the scene of the crime, nor does it make it an inaccurate or contrived depiction of those events.

¶40. The trial judge did not abuse his discretion in allowing Keyes to stop and rewind the tape as an aid to his testimony. As Keyes's manipulation of the speed and direction of the videotape was probative and not unduly prejudicial, admission of the videotape into evidence was not an abuse of discretion. This issue is without merit.

## VIII. THE TRIAL COURT ERRED IN ALLOWING THE STATE TO AMEND THE INDICTMENT.

¶41. Count Two of the original indictment returned against Spann states that Spann "[d]id unlawfully, wilfully and feloniously, with or without design to effect death, did kill a human being, to wit: Myong Cheon Son, while engaged in the commission of the crime of Robbery upon said Myong Cheon Son and Myong Ja Son, in violation of Section 97-3-73 of the Miss. Code of 1972, as amended, and all in violation of Section 97-3-19(2)(e), of the Miss. Code of 1972, as amended, against the peace and dignity of the State of Mississippi." Section 97-3-19(2), the capital murder statute, states:

> The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>
> . . . .
>
> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, **robbery**, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, **or in any attempt to commit such felonies**.

(emphasis added). Section 97-3-73 provides:

> Every person **who shall feloniously take** the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.

(emphasis added).

¶42. On November 19, 1998, the State filed its motion to amend the indictment, stating that the original indictment contained a scrivener's error and that it should be amended to read that the crime of robbery was committed in violation of Miss. Code Ann. § 97-3-79 rather than § 97-3-73. Section 97-3-79 provides:

> Every person **who shall feloniously take or attempt to take** from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery....

(emphasis added).

¶43. The trial court granted the State's motion to amend, finding that the change in the indictment was one of form and not substance. Spann argues that the trial court erred in finding the change in the indictment was not a substantive change.

¶44. An indictment may not be amended to change the nature of the charge, except by action of the grand jury which returned the indictment. *Miller v. State*, 740 So. 2d 858, 862 (Miss. 1999)(citing *Greenlee v. State*, 725 So. 2d 816, 819 (Miss. 1998)). To amend an indictment without action of the grand jury, the amendment must be of form and not of substance. *Id.* (citing *Greenlee*, 725 So. 2d at 821). "It is well settled in this state ... that a change in the indictment is permissible if it does not materially alter facts which are the essence of the offense on the face of the indictment as it originally stood or materially alter a defense to the indictment as it originally stood so as to prejudice the defendant's case." *Miller*, 740 So. 2d at 862 (quoting *Shelby v. State*, 246 So. 2d 543, 545 (Miss. 1971)). "The test for whether an amendment to the indictment will prejudice the defense is whether the defense as it originally stood would be equally available after the amendment is made." *Greenlee* at 822 (citing *Griffin v. State*, 584 So. 2d 1274, 1276 (Miss. 1991)).

¶45. Spann contends that the amendment to the indictment was an attempt to cut off a defense available to Spann under § 97-3-73, but not so readily available to Spann under § 97-3-79 - that is, that Spann did not take nor attempt to take the personal property of another. Spann's argument is misplaced. In order to convict Spann of capital murder under Count II of the original indictment, the State was required to prove that Spann either took the personal property of another, pursuant to § 97-3-73, *or* that he attempted to take the personal property of another, pursuant to § 97-3-19(2), which encompasses the killing of a human being during the commission of robbery or any attempt to commit robbery. Thus, under the original indictment, Spann had at least two defenses available to him under Count II - that is, that he did not take the personal property of another and that he did not attempt to take the personal property of another. The amendment to the indictment did not alter Spann's available defenses. Under Count II of the amended indictment, the State was required to prove that, in violation of § 97-3-79, Spann took or attempted to take the personal property of another by exhibition of a deadly weapon. Spann thus had available under the amended indictment at least two possible defenses to Count II - that is, that he did not take the personal property of another and that he did not attempt to take the personal property of another.

¶46. Spann relies upon this Court's decision in *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990), in arguing that the amendment to the indictment was one of substance rather than form. In *Quick*, the defendant was charged with aggravated assault in violation of Miss. Code Ann. § 97-3-7-(2)(b) in that he

"did willfully, unlawfully, feloniously, purposely an knowingly commit an aggravated assault upon [the victim] with a deadly weapon . . . ." The morning of trial, the State moved to amend the indictment to charge, after the word knowingly, the following: "intentionally or recklessly under circumstances manifesting extreme indifference to the value of human life contrary to § 97-3-7(2)(a) and (b) . . . ." The indictment was never formally amended, but the jury instructions reflected the additional language. This Court found that the additional language impermissibly constituted an amendment of substance to the indictment. *Id.* at 1200. *Quick* is clearly distinguishable from the amendment at hand. The amendment in *Quick* allowed the defendant to be convicted of aggravated assault under a lesser burden of production than that required by the initial indictment. That is, recklessness became an element of the crime charged, and though the defendant may have defended against the elements of purposely and knowingly, he was caught off guard by not having been put on notice that he must also defend against the element of recklessness. Such is not the case in the issue at hand. The amendment to the indictment added no additional elements to the crime charged, other than the additional requirement that the State prove that the robbery, or attempt thereto, was made with a deadly weapon. Such did not alter the defenses available to Spann.

¶47. The State, more appropriately, relies upon this Court's decision in *Davis v. State*, 684 So. 2d 643 (Miss. 1996). In *Davis*, the original indictment charged the defendant with capital murder, with an underlying felony of robbery in violation of § 97-3-73. The jury was instructed, however, as to the elements of armed robbery. On appeal, Davis alleged that the inconsistency allowed the State to broaden the charges of the indictment or to constructively amend the indictment. This Court rejected Davis's argument that the alteration was one of substance, stating:

> Because the indictment cited the robbery statute, Miss. Code Ann. § 97-3-73 (1972), Davis received adequate notice of the charges against him. Instruction S-3 defined robbery in terms of armed robbery which required the State to prove an element not required for a person to be charged with capital murder. Of import is the fact that any robbery occurred. All defenses and proof available to Davis remained equally applicable. Therefore, the amendment is one of form and not substance.

*Id.* at 660. Spann attempts to distinguish his case from *Davis* by stating that his defense that he did not take or attempt to take the personal property of another is not so readily available under § 97-3-79 as it is under § 97-3-73. As discussed above, however, and as noted in *Davis*, all defenses and proof available to Spann remained equally applicable. This assignment of error is without merit.

### IX. THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE SPANN'S CONFESSION.

¶48. Spann argues that the trial court erred by admitting into evidence his confession in that the confession was not given voluntarily and the waiver signed by Spann was not intelligently and knowingly made. Spann argues that, never having been previously arrested for a felony conviction, he was unfamiliar with police procedures. Subsequent to the hearing on Spann's motion to suppress, the trial judge found as follows:

> The Court does hereby find, beyond a reasonable doubt, under the totality of the circumstances, that no coercion or threats of any type were made or used against the defendant, no physical or mental torture existed against the defendant, no promises or favors were made to this defendant, and that he made a knowing and voluntary waiver of his privilege against self-incrimination. The Miranda Warnings were properly administered by the law enforcement prior to any interrogation and that the waiver was intelligent, knowingly and voluntarily made beyond a reasonable doubt. . . . The Court

finds, beyond a reasonable doubt and the totality of the circumstances, that the statement made by the defendant was freely and voluntarily made and is hereby ruled to be admissible.

The standard of reviewing the admission of a confession is well-settled. Determining whether a confession is admissible is a finding of fact which will not be disturbed on appeal unless it is manifestly in error or contrary to the overwhelming weight of the evidence. *Wright v. State*, 730 So. 2d 1106, 1108 (Miss. 1998); *Lee v. State*, 631 So. 2d 824, 826 (Miss. 1994). There is nothing in the record indicating manifest error in the trial judge's finding that Spann's statement was voluntarily and freely given.

¶49. "[T]he applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Porter v. State*, 616 So. 2d 899, 907-08 (Miss. 1993). When the voluntariness of a confession is questioned, the defendant has a due process right to a determination that the confession was in fact voluntarily given. *Stokes v. State*, 548 So. 2d 118, 121 (Miss. 1989). The procedural rule of *Agee v. State*, 185 So. 2d 671, 673 (Miss. 1966), requires that the trial court hold an evidentiary hearing upon the accused's objection to the introduction of the confession. The State bears the burden of proving all facts prerequisite to admissibility beyond a reasonable doubt. *Cox v. State*, 586 So. 2d 761, 763 (Miss.1991); *Neal v. State*, 451 So. 2d at 753. "This burden is met and a prima facie case made out by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily m ade without any threats, coercion, or offer of reward." *Cox*, 586 So. 2d at 763 (citing *Agee*, 185 So. 2d at 673). After the State has made out its prima facie case, the defendant must rebut the State's evidence by offering testimony that violence, threats of violence, or offers of reward induced the confession. *Id.*

¶50. The State clearly made out its prima facie case that the confession was made voluntarily and without any threats, coercion, or offer of reward. At the suppression hearing, in accordance with the *Agee* rule, the State offered the testimony of Detective Rusty Keyes, the officer who took Spann's statement and the only officer present at the time the statement was made. Keyes testified that Spann's father brought him to the police station and that Spann came to the station voluntarily. Keyes stated that he told Spann and Spann's father that he would like to talk to Spann and that Spann and his father said that was fine. Keyes testified that Spann's father stated that he would like to be present at the interview, but that he denied the request because Spann was an adult and Keyes wanted to interview him on a one-on-one basis. Keyes testified that when he took Spann into his office, he read him his rights and waiver of rights. At that time, Spann signed the waiver. Keyes stated that Spann signed the waiver freely and voluntarily, that he did not promise Spann anything in return for Spann's signature, that Spann did not appear to be under any kind of mental disability, and that Spann appeared to understand fully what he was doing. Keyes testified that he advised Spann of his rights a second time during the course of Spann's statement. Keyes testified that at the time Spann made his statement, he was very calm and collected, did not appear to be under the influence of alcohol or drugs, was able to talk to Keyes in an intelligent, reasonable, and rational manner, had no problem understanding or responding to anything Keyes asked him, and was promised nothing in return for his statement. When asked by Spann's attorney whether it was possible that Spann did not understand the magnitude of what was going on, Keyes responded that Spann fully understood what was happening. Spann's statement was reduced to writing and signed by Spann. Keyes testified that, after typing Spann's statement, he read the statement back to Spann at Spann's request, after which Spann signed the statement. The statement also bears the signature of a desk clerk from the police station to whom Spann swore that he was telling the truth and that the document contained his statement and his signature.

¶51. After the State made out its prima facie case, Spann was required to rebut the State's evidence by offering testimony that violence, threats of violence, or offers of reward induced the confession. Spann offered no such testimony. Rather, Spann complains that because of his age, limited intelligence, and lack of experience in police procedure, the trial court should have found that, considering the totality of the circumstances, his statement was not given voluntarily and that he did not knowingly waive his rights. This Court has stated that age and intelligence factors are to be considered in determining whether a waiver and a confession are free and voluntary, but that they are not controlling. *Coleman v. State*, 378 So. 2d 640, 644 (Miss. 1979). *See also Saucier v. State*, 328 So. 2d 355 (Miss. 1976); *Stewart v. State*, 273 So. 2d 167 (Miss. 1973). There was no testimony offered by Spann at the hearing regarding the effect of his age, which was nineteen at the time of the confession, or of his alleged limited intelligence on the voluntariness of his confession. This Court has stated that the youth factor is seldom per se conclusive that a confession was not freely and voluntarily given. *In re W.R.A.*, 481 So. 2d 280, 286 (Miss. 1985). Furthermore, it should be noted that, at least according to the Youth Court Act, Spann is not a youth. *See* Miss. Code Ann. § 43-21-105(d) (defining youth as a person who has not yet reached his eighteenth birthday). Regarding Spann's assertion that his intellectual capacity hindered his ability to understand the waiver of rights and to voluntarily make a statement, though this Court has held inadmissible the confession of a defendant with an IQ of 60, *see Dover v. State*, 227 So. 2d 296 (Miss. 1969), Spann made no demonstration before the trial court that he had any diminished intellectual capacity. The only evidence that Spann might have limited intellectual capabilities was presented during the penalty phase of the trial, where the defense offered evidence that Spann has an IQ of 85. Spann offered no such evidence at the suppression hearing.

¶52. Spann also asserts that, because his father was not present during his interrogation, his understanding of his rights was diminished and the interrogation was coercive. Spann's assertion that he should have been allowed to have his father present during the interrogation is without merit. *See Blue v. State*, 674 So. 2d 1184 (Miss. 1996) (where crime is such that circuit court has original jurisdiction, age had no special bearing on defendant's ability to be questioned without a parent and voluntarily waive his rights."). *See also* Miss. Code Ann. § 9-7-81 (giving circuit court original jurisdiction over "felonies, crimes, and misdemeanors, except such as may be exclusively cognizable before some other court"). Given the totality of the circumstances, the trial court did not err in admitting Spann's statement.

¶53. Spann does not expressly assert in his brief to this Court that his right to counsel was violated. He does, however, complain that his statement was taken by police after his lawyer may have contacted the police department. Because he did assert the right to counsel argument before the trial court in his motion to suppress and because such an alleged violation bears on the admissibility of his statement, it is briefly considered here. At the suppression hearing, defense counsel raised the inference, through its questioning of Keyes, that an attorney was called while Spann was at the station and that the attorney was on his way to the station at the time the statement was made. Keyes stated that Spann never asked for a lawyer at the time he made his statement and that Keyes knew of no lawyer that had called the station before the statement was made or during the time the statement was being made. Keyes testified that after Spann was taken to the jail, he was advised that Spann's uncle "sent a message up to talk with Tracy Klein," an attorney, and that he did not know that an attorney was on the way to the station until after Spann was in jail, which was subsequent to the time the statement was taken.

¶54. Other than the questions asked of Keyes on cross-examination, the defense put on no evidence that an attorney had been called by any member of Spann's family, that an attorney called the station, or that an

attorney was on the way to the station. In fact, Spann states in his brief to this Court that his confession took place "without a lawyer present, who *may* have contacted the police department prior to the statement being given." Based on the failure of defense counsel to make anything more than tentative allegations regarding this issue, it is the conclusion of this Court that Spann's right to counsel was not violated.

### X. THE TRIAL COURT ERRED IN FAILING TO GRANT SPANN'S JURY INSTRUCTION REGARDING THE AGE OF HORNE AND HIS ELIGIBILITY TO RECEIVE THE DEATH PENALTY AND PROHIBITING DEFENSE COUNSEL FROM ARGUING THAT HORNE WAS INELIGIBLE TO RECEIVE THE DEATH PENALTY.

¶55. Spann challenges the trial court's refusal of instruction D-17, which concerned the age of co-indictee Jerrian Horne and his eligibility to receive the death penalty. The instruction provides as follows:

> The Court instructs you that at the time of the incident in question, one of the co-defendants, Jerrian Horne, a/k/a "Bay Bay," was fourteen (14) years old. The Court further instructs you that as a matter of law, the State of Mississippi cannot seek the death penalty nor can a jury impose the death penalty against Jerrian Horne due to his age. The Court will remind you that the evidence produced by the State of Mississippi established that the shot fired by Jerrian Horne, a/k/a/ "Bay Bay," fatally wounded the decedent, Myong Cheon Son. You should consider these factors as you deliberate the charges against the defendant in this case, Ellis Spann III.

¶56. This instruction was apparently an effort on the part of defense counsel to persuade the jury that because Horne delivered the shot which took Son's life and because Horne cannot receive the death penalty, it would be unfair to sentence Spann to the death penalty. Such would impermissibly encourage the jury to decide the case on something other than the law of this State.

¶57. Alternatively, in light of the assumed purpose of giving the instruction, any error in denying the instruction is harmless as Spann did not receive the death penalty.

### XI. THE STATE'S EXERCISE OF PEREMPTORY STRIKES VIOLATES *BATSON V. KENTUCKY*.

¶58. Spann is an African-American. The State used five of its twelve strikes against white members of the venire and seven of its strikes against black members of the venire, resulting in a jury of eleven whites and one black. After the State had exercised its peremptory challenges, the court requested that the State give race-neutral explanations for its strikes. The following exchange occurred:

> THE COURT: In light of the *Batson* challenges, number 5 was S1. Will you give me your reasoning behind it?

> MR. CARTER: First I would like to say for the record that a case hasn't been made. We had 12 strikes; we struck five of the Caucasian race and seven of the African-American.

> THE COURT: I understand the prima facie thing behind *Batson*, but since this is a capital case, out of an abundance of caution, I am not going to make them reach those prongs. Let's go with it. I understand what you are saying. Give me your reasons.

The State proceeded to present explanations for each of its strikes against black jurors. The court expressly

found that each explanation offered was race neutral. Spann argues that the trial court erred by failing to make an on-the-record factual determination as to the reasoning given for the strikes of each challenged juror. Spann contends that, in this regard, the trial court failed to comply with the requirements of ***Hatten v. State***, 628 So. 2d 294 (Miss. 1993) (requiring that the trial court make an on-the-record factual determination of the merits of the reasons cited by the State for its use of peremptory challenges). To the contrary, as noted previously, the trial court made express, on-the-record, factual determinations as to the explanations offered by the State for each of its strikes. This contention is without merit.

¶59. Spann also argues that the State's explanations for three of the seven strikes against black jurors were not sufficiently race-neutral. The State gave as its race neutral explanation for striking potential juror Dennis L. Kendrid Dennis that she was acquainted with Spann's relatives and knew several of the witnesses. Spann argues that this is not a race-neutral explanation. This Court has condoned a peremptory challenge against a juror who was acquainted with the defendant's family. ***Porter v. State***, 616 So. 2d 899, 907 (Miss.1993). The fact that a potential juror is familiar with witnesses is a logical concern, and has appropriately been held by our Court of Appeals to be a valid, race-neutral explanation for State's exercise of peremptory challenges. *[Salter v. State](#)*, 735 So. 2d 1089, 1091 (Miss. Ct. App. 1999).

¶60. The State gave as its race-neutral explanation for striking potential juror Lula May Barnes that she knew some of Spann's family members. Also, on Barnes's questionnaire she stated that she did not believe in the death penalty, but, during voir dire, stated that she did believe in the death penalty. Spann argues that these are not race-neutral explanations. As discussed above, the fact that Barnes was acquainted with members of Spann's family is a race-neutral explanation. *See **Porter***, 616 So.2d at 907. Also, this Court included inconsistent statements in its listing of acceptable race-neutral explanations in ***Lockett v. State***, 517 So. 2d 1346, 1356 (Miss. (citing ***Rodgers v. State***, 725 S.W.2d 477, 480 (Tex.Ct.App. 1987) (inconsistency between oral responses and juror's card)).

¶61. The State offered as its race-neutral explanation for striking potential juror Mary L. Brown that Brown was born in 1930 and thus might not be able to pay proper attention at trial due to he age. Included in ***Lockett***'s list of acceptable race-neutral explanations is the age of a juror. ***Lockett***, 517 So. 2d at 1356 (citing ***Chambers v. State***, 724 S.W.2d 440, 442 (Tex.Ct.App.1987)); ***Taitano v. State***, 4 Va.App. 342, 358 S.E.2d 590 (1987); Also, this Court has accepted inattentiveness as a race-neutral explanation for the exercise of peremptory strikes. *See **Mack v. State***, 650 So. 2d 1289, 1299 (Miss. 1994); ***Abram v. State***, 606 So.2d 1015 (Miss.1992); ***Lockett***, 517 So.2d at 1356-57 (citing ***United States v. Matthews***, 803 F.2d 325, 331 (7th Cir. 1986); ***Townsend v. State***, 730 S.W.2d 477, 480 (Tex.Ct.App. 1987)). Spann contends that the State's explanation was pretextual. This Court accords great deference to the trial court in determining whether the offered explanation is truly a race-neutral reason. *[McFarland v. State](#)*, 707 So. 2d 166, 172 (Miss. 1997) (citing ***Stewart v. State***, 662 So. 2d 552, 558 (1995)). Spann offered no explanation to rebut any of the reasons offered by the State as to Brown or any other juror, either before the trial court or in his argument to this Court. In determining whether a race-neutral explanation is pretextual, the burden remains with the opponent of the strike. *[Purkett v. Elem](#)*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Spann has made no effort to meet the burden of demonstrating that the State's explanations were pretextual.

## CONCLUSION

¶62. Each of Spann's assignments of error is without merit. The judgment of the Forrest County Circuit Court is affirmed.

¶63. **COUNT I: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. COUNT II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT BENEFIT OF PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED**. **SAID SENTENCES SHALL RUN CONSECUTIVELY.**

**PRATHER, C.J., BANKS, P.J., McRAE, MILLS, WALLER, COBB AND DIAZ, JJ., CONCUR. PITTMAN, P.J., NOT PARTICIPATING.**

1. Horne's nickname is Ba-Ba, and McLaurin's nickname is Fatso.