ALBERT C. BRETT v. STATE OF MISSISSIPPI.

[47 South. 781.]

1. CRIMINAL LAW AND PROCEDURE. *Murder. Evidence. Photographs.*

In a murder case, pictures, not representations of the scene of the homicide, but created by the joint efforts of the state's leading witness, whose testimony is controverted, and a photographic artist, are not admissible in evidence.

2. SAME. *Instruction. Maliciously. Malice aforethought.*

The word "maliciously," used in an instruction in a murder case, does not convey the same meaning or have the same force and effect as the words "malice aforethought."

3. SAME. *Same. On weight of evidence.*

An instruction in a murder case is not on the weight of evidence where it simply charges that the defendant is guilty of murder if the jury believe from the evidence, beyond a reasonable doubt, that he wilfully and maliciously shot and killed the deceased with a deadly weapon, at a time when defendant was not in imminent danger and when he had no reasonable ground to apprehend such danger.

4. SAME.　*Charges already given.*

　Where every phase of defendant's case is fully covered by instructions already given, at his request, it is not error to refuse further instruction asked by him.

FROM the circuit court of Covington county.

HON. ROBERT L. BULLARD, Judge.

Brett, appellant, was indicted, tried and convicted of murder, sentenced to the penitentiary for life and appealed to the supreme court. The facts are fully stated in the opinion of the court.

*Robert N. Miller* and *Hugh Barr Miller,* for appellant.

*George Butler,* assistant attorney-general, for appellee.

[The reporter has been unable to find the briefs of counsel in this case, hence no synopsis of them is given herein.]

WATKINS,* Special Judge.

The appellant was indicted by the grand jury of Covington county for the killing of one Daniel G. McCann, which occurred in the town of Mt. Olive on the 8th day of July, 1908. He was convicted of murder, and sentenced to life imprisonment in the state penitentiary. The deceased was engaged in editing and publishing a newspaper at Mt. Olive, and occupied for that purpose a one-story frame building, situated on the south side of the town, facing north. From the roof of the building an awning projected over the sidewalk, which awning extended the entire width of the building. On the east side of this building there was a vacant space of about thirty-six feet in width, and on the west a two-story frame building, the second story of which was occupied by the Cumberland Telephone Company as an ex-

---

* FLETCHER, J., having been of counsel in this case before his appointment to the bench, was disqualified to preside and William H. Watkins, Esq., a member of the supreme court bar was appointed and presided in his place.

change. From the latter building a porch or gallery extended from the second story immediately over the sidewalk, which gallery had around it banisters through which there were openings about ten inches in size.

The principal witnesses for the state were one Carl Speed and his wife. Speed claims that, being attracted by the difficulty below, he went to the window, situated at the north end of the second story occupied by the Telephone Company, and while kneeling on the floor, with his elbows in the window, viewed the homicide through an opening in the banisters by looking under the awning which covered McCann's building; that he could see McCann distinctly, but that not more than half of Brett's body could be seen. Mrs. Speed testified that she was standing against the wall, just west of the window out of which her husband was looking, and with her head slightly inclined also viewed the homicide by looking through one of the openings in the banisters and under the awning; it being asserted by both witnesses that McCann was standing, at the time he was shot, at some point on the sidewalk in front of the open space above indicated, a few feet east of the outer wall of the building occupied by him (the exact point being in dispute), and that Brett also stood on the sidewalk near the eastern side of the thirty-six-foot space which intervened. Both of these witnesses testified that from their respective positions they saw the fatal shot fired, and their testimony, if believed by the jury, was very damaging to the appellant.

Counsel for the appellant below at the trial of this case seriously questioned the ability of Speed and his wife to see the homicide, situated as they then were, contending that it was impossible for them to have seen either of the parties. While there were other witnesses for the state directly across the street, one hundred and ten feet distant, who claimed to have seen the homicide, it cannot be doubted but that the truth or falsity of the testimony of Mr. and Mrs. Speed was the most material issue of disputed fact. About three days after the

trial began, and just prior to the close of the state's case, Speed and one of the attorneys for the prosecution took a photographer to the scene of the killing and had him make some photographs of the situation as the witness Speed claimed it existed. It will only be necessary for us to refer to two of these photographs. Exhibit A was taken by having the photographer place his instrument at a point on the sidewalk in front of the thirty-six foot vacant space east of the building occupied by McCann, where Speed testified that McCann stood when he was shot; and it must be borne in mind that the exact point was a matter of dispute, even among the state witnesses. Then the witness Speed and one of the attorneys for the state went upon the gallery in front of the telephone office, Speed putting himself in the position in which he claims to have been at the time he saw the killing, and the assistant prosecuting attorney putting himself in the position in which it is claimed Mrs. Speed was standing at the time of the occurrence, and the photograph offered as Exhibit A by the state represents Mr. and Mrs. Speed peering through the openings in the banisters under the awning and out to the sidewalk beyond. Exhibit C represents the two-story building occupied by the telephone company, the one-story building occupied by McCann, and the thirty-six foot space east of the McCann building. The assistant prosecuting attorney was standing at a point where Speed testified that the deceased stood at the time the shooting occurred, and the witness Speed himself took the position where he claimed the appellant was standing at the time of the shooting; the photographs being taken from the opposite side of the street. Exhibits A and C were both offered in evidence upon the part of the state, and were objected to by the appellant's counsel on the ground that they were not pictures of the actual occurrence as it took place, but were artistic reproductions arranged by the state's chief witness, and that the photographs did not represent the parties as being where the evidence showed them.

The court sustained the objection made by the appellant in

reference to Exhibit C, but admitted over the appellant's objection the photograph introduced as Exhibit A. The admission of this photograph was fatal error. In the first place, it was a disputed fact in the case as to whether or not McCann, at the time he was shot, stood at the point taken by the photographer in obtaining the photograph, from which point he was able to depict the faces of the witnesses looking through the holes, under the awning, out to the sidewalk, where Speed says the deceased was standing. In addition to this, Mrs. Speed testified positively that she was a grown woman, about five feet high, and was standing erect on the gallery and viewed the homicide through the opening in the banisters and under the awning by slightly inclining her head, from which position she claimed and testified that she could see McCann and a portion of the body of Brett, while the photograph before us, which was admitted by the court and marked Exhibit A represents Mrs. Speed as being in a stooping position, looking through the hole in the banisters, with her face not more than two and one-half feet from the floor. The precise point involved here is covered by the case of *Fore v. State,* 75 Miss. 738, 23 South. 712, in which the following language was used: "The photographs, and all the evidence touching them, should have been excluded. They were not simply reproductions of the scene of the homicide. They were photographic reproductions of tableaux vivantes, carefully arranged by the chief witness for the state, whereby his version of the tragical occurrence should be brought vividly before the mind's eye of the jury, and be impressed upon the jury as the view of the actual occurrence, and not as the mere statement of the facts of that occurrence as detailed by this witness. Their effect, if not their purpose, was by photographic processes to strengthen and bring out in striking and captivating fashion the version of the difficulty as given the jury in this witness' evidence. We repeat: The pictures were not photographic representations of the scene of the lamentable tragedy. They were artistic reproduc-

tions of situations carefully planned by the state's chief witness. Their only effect was to engrave upon the jury's memory the account of the homicide given by the witness—an account at variance with that of at least two eyewitnesses of the homicide. That they were hurtful to the prisoner cannot be doubted. Indeed, with the average jury, these dumb witnesses, created by the joint efforts of the state's leading witness and the photographic artist, might go far to secure a verdict for the party offering them."

The giving of instruction No. 1 for the state was erroneous. The instruction is in the following language: "For the state the court instructs the jury that if they believe from the evidence, beyond a reasonable doubt, that the accused willfully and maliciously shot and killed the deceased with a deadly weapon at the time the accused was in no imminent danger, real or apparent, of losing his life or of having some great bodily harm done to him at the hands of deceased, and at a time when the accused had no reasonable ground to apprehend such danger, then the accused is guilty of murder, and the jury should so find, and whether they believe from the evidence that the deceased at the time was armed or unarmed, and whether he was advancing upon the accused or was standing still." In this instruction the word "maliciously" is used as having the same meaning as premeditated design under our statute, or malice aforethought. "Maliciously" and "malice aforethought" do not mean the same thing. Malice comprehends ill will, a wickedness of disposition, cruelty, recklessness, a mind regardless of social duty, etc.; while malice aforethought or premeditated design has a more intense meaning. They comprehend, not only what is included within the term "malice," but in addition thereto mean "premeditated malice." See Am. & Eng. Ency. of Law (2d ed.), vol. 21, p. 133; Bishop's Criminal Law (8th ed.), vol. 1, p. 261; *Patterson v. State,* 66 Ind. 185; *Tutt v. Commonwealth,* 104 Ky. 299, 46 S. W. 675; *State v. Green,* 42 La. Ann. 644, 7 South. 793; *State v. Curtis,* 70 Mo. 594; *Cravey*

v. *State,* 36 Tex. Cr. R. 90, 35 S. W. 658, 61 Am. St. Rep. 833; Words and Phrases, vol. 5, p. 4304.

We approve the language used by the Court of Appeals of the state of Kentucky in the case of *Tutt v. Commonwealth,* 104 Ky. 299, 46 S. W. 675, in passing on the identical question: "There can be no question but what malice aforethought is indispensable to a conviction for murder in all cases of homicide, and, in order to convict a party charged with murder, it is indispensable that the jury shall believe to the exclusion of a reasonable doubt that the defendant not only killed the person, but that such killing was with malice aforethought. It will be seen that the instruction given omits any reference to the question of malice aforethought, but instructs the jury, if the killing be willful, felonious, and malicious, that they may find him guilty of murder, and fix his punishment at death or confinement in the penitentiary for life. The extreme penalty of the law was inflicted by the verdict of the jury. It is not deemed necessary to cite authority in support of the proposition that the instruction quoted is erroneous. The practice, so far as we are advised, is to always include, in an instruction on the subject of murder, that to constitute the offense of murder the killing must have been with malice aforethought; and, inasmuch as no person can be guilty of the offense of willful murder without malice aforethought, it necessarily follows that the instruction given must conform to the law."

We are fully aware of the fact, however, that our own court, as well as courts of last resort of other states, have frequently used the word "malice" as being synonymous with "malice aforethought." This use, however, is not accurate. This instruction, however, is not open to the objection urged by counsel for the appellant as being on the weight of the testimony. In all other respects the instruction is correct. Instruction No. 3 for the state is subject to practically the same criticism.

There was no error in refusing any of the instructions for the appellant assigned as error, since every phase of appellant's

case was fully covered by the twenty-six instructions given by the court.

For the errors indicated, the judgment is reversed and the cause remanded.                                              *Reversed.*