MARTIN *v.* STATE.

May 11, 1953

No. 38717 31 Adv. S. 28 64 So. 2d 629

*Wingo & Finch,* for appellant.

*J. T. Patterson,* Assistant Attorney General, for appellee.

ARRINGTON, J.

The appellant, G. W. Martin, was convicted of the murder of Jessie Cooper and the jury being unable to agree upon the punishment, he was sentenced by the court to a life term in the penitentiary.

On Saturday afternoon, July 19, 1952, Leon Z. Middlebrook, Jr., and the deceased, Jessie Cooper, were travelling over Highway No. 11 in Jasper County when they noticed a peach orchard and stopped to get some peaches around 6:00 or 6:30 in the afternoon. Middlebrook, the driver of the automobile, parked the car on the right hand side of the highway and Cooper got out of the car and went into the orchard. As he started picking some peaches, a rifle started firing and Cooper immediately started running for the car. The rifle continued to fire, firing approximately ten times, and as Cooper got within six feet of the car he hollered and upon reaching the car told Middlebrook he was shot. He got into the car and Middlebrook proceeded to Pachuta in an attempt to get him to a doctor. Upon his arrival there, a doctor was summoned, who found that Cooper was dead. Upon examination, it was found that he had been shot in the back under the left shoulder blade.

Sheriff J. E. Pittman of Jasper County was notified of the shooting of deceased around eight o'clock that night. He immediately proceeded to investigate the killing, going to the home of appellant, G. W. Martin, who owned the peach orchard, where he arrested him, took his rifle and a number of cartridges and placed him in the Jasper County Jail at Bay Springs. The next morning he returned to the appellant's home, carrying with him the two negro boys who were working for the appellant picking peaches and who were present at the time of the shooting. These boys pointed out to the sheriff where the appellant was standing on the premises at the time he was shooting, and the sheriff asked the boys to hand him the empty shells. Cleo Trotter picked up five

empty shells and handed them to him. These empty shells, the bullet which was removed from the body of deceased, the rifle and the cartridges were later turned over to the Federal Bureau of Investigation, and it was shown that the bullet which was removed from the body of Cooper was fired from the rifle used by the appellant. Cleo Trotter, a 14-year-old negro boy who was working for appellant, testified for the state that on the day of the shooting, the appellant, appellant's wife, the other negro boy and he were returning from the barn on appellant's farm, and as they crossed the highway going to the home, they saw a car parked on the highway by the peach orchard. This witness testified that the appellant remarked ''Yonder a car is.'' The appellant went in the house, came out with his rifle, and started shooting in the direction of the parked car. This witness testified that he saw a boy running towards the car.

The appellant testified in his own behalf and admitted that the rifle belonged to him and that he had fired the gun on the evening the deceased was killed. He testified further that he did not see the car or the deceased; that he was shooting at birds in the orchard and did not know that deceased had been killed until later that evening.

The appellant assigns as error that the court erred in admitting, over the objection of the appellant, the testimony of the sheriff relating to the five empty shells found upon the premises of the appellant and their introduction in evidence on the grounds that the sheriff was unlawfully on the premises because he did not have a search warrant. We are of the opinion that this assignment is well taken. The sheriff admits that he did not have a search warrant, but contends that he did not go back to the appellant's home or premises for the purpose of making a search, but only for the purpose of making further observation and investigation of the homicide. The sheriff had no authority to go upon the premises of

appellant while he was in jail without a search warrant. The state attempts to justify his action on the ground that it was an incident to the lawful arrest which was made the night before. Further, that the five empty shells were picked up and given to the sheriff by the negro boy, Trotter, and for this reason the search and seizure provision of our constitution, Sec. 23, is not applicable as it does not apply to private persons. It is also argued that the sheriff was authorized by one Blackledge, brother-in-law of appellant who was in charge of the premises, to make such further investigation as he desired to make.

In Lancaster v. State, 188 Miss. 375, 195 So. 320, Lancaster was charged with the murder of his wife, arrested and put in jail, and on the next day the sheriff, with a void search warrant, went to the premises of Lancaster looking for the death instrument. His search resulted in the finding of an axe in a well on the place. The trial court sustained objection of appellant to the sheriff testifying, but permitted over objection an individual who stood on her premises and witnessed the search made by the sheriff and the axe drawn out of the well to testify to such facts. The state, in that case, contended that the search by the sheriff with a void search warrant was legal as an incident to the arrest of the appellant. The state also contended that the search was valid because the appellant gave his consent thereto. In that case, the Court said:

"It is argued that the search by the sheriff without warrant was legal because it was merely incidental to a valid arrest by him of appellant. . . . Here, one day there was an arrest on the premises and appellant lodged in jail, and on the next day, the search was made. It was not incident to the arrest. The sheriff had no control at that time over the premises as an incident to the arrest.

"It is argued further that the search was valid because appellant gave his consent thereto. There was no

attempt to show that appellant gave his consent to the search made on the day after the homicide, during which the axe was found in the well. The record shows that on the day before when the sheriff arrived on the scene, he made no objection to his looking around over the premises. The fact that the owner neither consented nor objected to the search would not constitute a waiver. Smith v. State, 133 Miss. 730, 98 So. 344; Boyd v. State, 164 Miss. 610, 145 So. 618. In the Smith case, the owner of the place said to the searching officer, 'All right, you are welcome to find it if you can.'

''While the search was being made, Miss Moore, whose home was only a short distance from the Lancaster home and on an adjoining lot, stood on her premises and saw the search made by the sheriff and the axe drawn out of the well. Over appellant's objection, she was permitted to testify to those facts. We are of the opinion that the court erred in admitting her testimony. It is true that it was not based on any search that she made, but on one made by the sheriff, which was illegal. Her incompetency is upon the same ground as that of the sheriff. To hold otherwise would mean that bystanders off of the premises being illegally searched would be competent to testify to what the search revealed, although the officer making the search would be incompetent.''

Appellant next argues that the court erred in admitting in evidence over the objection of the appellant a number of photographs which were made at the scene of the killing under the direction of the sheriff, a state witness, by a commercial photographer. The record shows that the sheriff, on the Saturday preceding the trial of the case, went to the premises of appellant and made a number of photographs. Several of these photographs show the sheriff standing in the place where the appellant Martin stood at the time of the shooting, as pointed out to him by the negro boy Trotter. The county attorney was standing in the place of the deceased, Cooper, at the time he was shot, as pointed out by Middlebrook. Another

one of the photographs shows the sheriff standing at a point where the deceased came out of the peach orchard and the automobile on the highway, as pointed out by Middlebrook. According to the testimony of the state's witnesses and the appellant Martin, the position in which he stood at the time of the shooting was in dispute. Under the authority of Fore v. State, 75 Miss. 727, 23 So. 710, this assignment is well taken and it was error to introduce these pictures in evidence. In this case, according to the statement of the case as reported in Southern Reporter, page 710, it is stated:

"On the trial a series of photographs were introduced, over defendant's objection. It seems that a witness for the state went to the scene of the killing with a photographer and placed a buggy, with a man in it, in the attitude in which he (the witness) said Matthews was when he was shot. He then put a man in the attitude where he said appellant was. He had the buggy and the two men and the wagon all photographed. These were the photographs introduced over defendant's objection."

The Court, in its opinion as to admission of the photographs, said: "The photographs, and all the evidence touching them, should have been excluded. They were not simply reproductions of the scene of the homicide. They were photographic representations of tableaux vivants carefully arranged by the chief witness for the state, whereby his version of the tragical occurrence should be brought vividly before the mind's eye of the jury, and be impressed upon the jury as the view of the actual occurrence, and not as the mere statement of the facts of that occurrence as detailed by this witness. Their effect, if not their purpose, was by photographic processes, to strengthen and bring out in striking and captivating fashion the version of the difficulty as given the jury in this witness' evidence. We repeat, the pictures were not photographic representations of the scene of the lamentable tragedy; they were artistic reproductions of situations carefully planned by the state's chief

witness. Their only effect was to graven upon the jury's memory the account of the homicide given by the witness—an account at variance with that of at least two eyewitnesses of the homicide. That they were hurtful to the prisoner cannot be doubted. Indeed, with the average jury, these dumb witnesses, created by the joint efforts of the state's leading witness and the photographic artist, might go far to secure a verdict for the party offering them." See also Brett v. State, 94 Miss. 669, 47 So. 781.

It is also argued that the court erred in refusing the following instruction: "The court instructs the jury to find the defendant not guilty of murder." In support of this assignment, it is contended that under Sec. 2225, Code of 1942, appellant could not have been guilty of anything more than manslaughter. Sec. 2225 provides: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."

The appellant did not claim to have killed the deceased while resisting an attempt to commit an unlawful act. On the contrary, his testimony was that he was shooting birds in the orchard, that he did not see the car, neither did he see the deceased, but that if the boy was shot it was unintentional and accidental. Therefore, we hold that this section is not applicable, and its refusal was not error. Richardson v. State, 153 Miss. 654, 121 So. 284; McPhay v. State, 87 Miss. 456, 40 So. 17.

According to the record, the evidence on the part of the state was sufficient to find that the killing was murder. Upon the facts in this case the question was for the determination of the jury as to whether the appellant was guilty of murder or manslaughter.

For the errors indicated above, the judgment of the lower court is reversed and the cause remanded.

Reversed and remanded.

*Roberds, P. J.,* and *Hall, Lee,* and *Ethridge, JJ.,* concur.