413 So.2d 1016 (1982)
Rennie Ray HARRIS
v.
STATE of Mississippi.
No. 53420.
Supreme Court of Mississippi.
May 5, 1982.
*1017 M. Charles May, C. Eiland Harris, Jackson, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before SUGG, ROY NOBLE LEE and DAN M. LEE, JJ.
ROY NOBLE LEE, Justice, for the Court:
Rennie Ray Harris was indicted and tried in the Circuit Court of the First Judicial District of Hinds County, Honorable William F. Coleman, presiding, on a charge of murder. He was tried on April 13, 1981, convicted of manslaughter and sentenced by the court to serve a term of twenty (20) years with the Mississippi Department of Corrections. He has appealed and assigns seven (7) errors in the trial below.
During the early morning hours of October 20, 1980, Cynthia Coleman was awakened in her apartment, Building # 13 of the Christian Brothers Apartments, Jackson, Mississippi, by a noise outside her apartment, which sounded as if the stair railings were rattling. She got up and walked from her bedroom into the living room near the stairwell, where she heard something like footsteps coming down the stairs. Mrs. Coleman looked out the living room window facing the parking lot and saw three (3) men fighting along the sidewalk. As the men turned left and moved outside, she walked back to her bedroom window where she could obtain a better view of what was happening. In front of the next apartment building (Building # 14), she saw two (2) men knock down a third man and one of the attackers strike the fallen person several times with a large stick or board. The man on the ground never cried out. She saw one of the assailants reach down and appear to take something from the victim's pockets.
Mrs. Coleman awakened her male bedfellow and told him what she had seen. He advised her not to worry because, if the man were hurt he would cry out for help; he told her she should go back to sleep. However, she went into the living room and watched the two men as they walked back towards her apartment building.[1] When the two men walked up the sidewalk, Mrs. Coleman opened her door, which faced out into the breezeway, and looked down through the railing at them. When they were approximately twenty (20) feet away, one of the men saw her and said, "Hey, Miss Lady, what's going on?" Mrs. Coleman later identified the speaker as appellant, but she could not identify the other man, since his head was turned away at the time.[2] According to Mrs. Coleman, the men walked through the breezeway and out of *1018 sight. She went back to her bedroom window and looked at the victim still lying on the ground, but the body never moved. The police arrived on the scene approximately thirty (30) to forty-five (45) minutes later.
Mary Belle Griffin lived in the same apartment building but in the lower left-hand corner. She was awakened at approximately 3:00 a.m. when she heard a scuffling noise outside her door. She got out of bed and walked into the bathroom, when she heard a knock on the front door. She answered the door and saw James Bass, a neighbor who lived directly across the breezeway from her. He stated that someone had beaten a man outside their building and asked her to call the police. First, Mrs. Griffin and Bass walked over to the victim's body (later identified as Jessie James Shelby, a deaf mute), saw that he appeared to be dead, and she immediately called the police. At that time, a drizzling rain was falling; however, it began to rain somewhat harder when the police arrived shortly thereafter.
Bass testified he heard the two men come down the stairs of his apartment building. He looked out the living room window and watched the two men beating and shoving on Shelby as they moved down the sidewalk. They knocked Shelby down in front of Building # 14 and one of the men struck Shelby more than once with a board or stick while he was on the ground. The other man reached down and took something from Shelby's pockets. Then the two men walked back towards his building and through the breezeway, but Bass could not identify them because his window was "foggy." He heard Mrs. Coleman's door close up on the second level after he heard one of the two men speak to her. He thought she said something in response, but could not make out the conversation. Bass walked out to the body with Mrs. Griffin. He said that he saw two people looking out the open bedroom window of Mrs. Coleman's apartment, but could not identify them.
When the police arrived, they found the body of Jessie James Shelby lying on the steps of apartment Building # 14. A large board was found near the body and a splintered piece of wood, apparently from the same board, was found nearby. Shelby was dead, his pockets had been turned inside out and twenty-one cents (21¢) was found next to the body. The police interviewed residents of the apartment complex, including Mrs. Coleman, who said that she did not see anything. Approximately one week later, Mrs. Coleman went to the police and told them that she had seen Shelby slain but that she denied knowing anything about it when the police first came to see her because she was afraid and did not want to get involved. Mrs. Coleman picked out appellant's picture from two separate groups of photographs shown to her by the police, after which the appellant was arrested.

I.-II.

Did the lower court err in declining to sustain appellant's motion for a directed verdict after the State concluded its evidence?

Was the verdict of the jury against the overwhelming weight of the evidence?
After the motion for directed verdict was overruled, appellant introduced evidence in his own behalf. It is elemental that after a motion for directed verdict is overruled at the conclusion of the State's evidence, and the appellant proceeds to introduce evidence in his own behalf, the point is waived. In order to preserve it, the appellant must renew his motion for a directed verdict at the conclusion of all the evidence.[3]Ross v. State, 234 Miss. 309, 106 So.2d 56 (1958); Fields v. State, 293 So.2d 430 (Miss. 1974). Also see State v. Russell, 358 So.2d 409, 413 (Miss. 1978). However, we consider the question of whether or not the verdict is contrary to the overwhelming weight of the evidence.
In addition to the evidence set forth hereinabove, one James Herring testified that he saw appellant at a poolroom in the early morning hours of October 20, 1980, and that *1019 he heard appellant say to several people, "That deaf dude has won a lot of money. When he leaves, let's take it."
We are of the opinion that the evidence was sufficient to constitute a guilt issue for the jury and that it supported the verdict of the jury.

III.

Was the verdict of "Guilty of Manslaughter" supported by the evidence?
The lower court granted a manslaughter instruction at the request of the State, and, while the appellant contends the court was required to grant the manslaughter instruction, he argues that the evidence in the case did not support a conviction for manslaughter and that granting the instruction constitutes error.[4]
The facts of this case, as stated, support a conviction of murder or manslaughter. Again, it is elemental that where the evidence supports a charge of murder, the appellant cannot complain of a conviction on the lesser charge of manslaughter, the rationale being that he is fortunate to be convicted of the lesser offense. The Court stated in Huston v. State, 105 Miss. 413, 62 So. 421 (1913):
Technically the contention of defendant may be flawless; but practically we think it is without substance or merit... . Upon an indictment charging murder, the person charged may be legally convicted of manslaughter, provided there is evidence justifying the belief that the defendant is guilty of the lesser crime. This is admitted; but it is contended that there was no evidence even tending to prove manslaughter. The reply is that there was abundant evidence to prove murder ... and we are unable to see how he can complain of the instruction on manslaughter, or of the verdict of the jury. [105 Miss. at 419-420, 62 So. at 422].
The lower court committed no error in granting the manslaughter instruction.

IV.-V.

Did the lower court err in admitting photographs of the scene that were not true and correct representations as it existed on the night of the homicide?

Did the lower court err in admitting State's Exhibit # 8, a photograph, which contained the picture of a policeman, when it was not a true and correct representation of the scene at the time of the homicide?
The homicide occurred at approximately 3:00 a.m. on October 20, 1980. A number of photographs were taken by Officer Billy Joe Biggert on April 9, 1981, which showed the scene during daylight hours. They included shots of the apartment building, the walks and grounds around the building, and the railings and entrance to the building. The State's announced purpose for introducing the photographs was to show distance, points of view, and layout of the scene. They were indicated to be true and accurate representations of the scene at the time of the crime, except for time of day and the fact that they were taken in the daylight rather than nighttime. The photographs were relevant to show the scene and the distances and were competent with the explanation of the differences in the scene because of nighttime and daylight hours. The court did not abuse its discretion in admitting such photographs. Willette v. State, 224 Miss. 829, 80 So.2d 836 (1955).
The most serious argument of appellant, concerning introduction of the photographs, relates to Exhibit # 8, which shows a police investigator standing near the door of Mrs. Coleman's apartment. Appellant contends that it is a staged picture to impress the jury and is a pictorial tableau ("tableau vivant"), which has been held inadmissible by this Court. Fore v. State, 75 Miss. 727, 23 So. 710 (1898); Brett v. State, 94 Miss. 669, 47 So. 781 (1909); Martin v. State, 217 Miss. 506, 64 So.2d 629 (1953); and Buie v. State, 217 Miss. 695, 64 So.2d 897 (1953).
*1020 Prosecuting attorneys and trial judges should be cautious in offering, and admitting, in evidence photographs of a staged scene with individuals pointing to objects or standing around the scene in situations similar to the one here. However, under the facts of this case, it is difficult to see how the appellant could be prejudiced by the fact that a police investigator appeared in the photograph, particularly in view of the admissibility of many other photographs in the case. In Wall v. State, 413 So.2d 1014, (Miss. 1982), the Court held that the appearance in a photograph of a chief witness for the State, dressed like he was on the night of the homicide, pointing at a vital item of evidence, did not constitute vital item of evidence, did not constitute reversible error under the facts of that case. We are of the same opinion in the case sub judice.

VI.-VII.
We have carefully considered the last two contentions of appellant to the effect that (1) the court erred in permitting impeachment of a witness with prior inconsistent statements after the prosecuting attorney failed to produce a prior written statement, and (2) the verdict of the jury evinces bias and prejudice on the part of the jury, and find same to be without merit.
The judgment of the lower court is affirmed.
AFFIRMED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM, BOWLING, HAWKINS, DAN M. LEE and DARDEN, JJ., concur.
NOTES
[1] Mrs. Coleman lived in a building comprised of four (4) units on each side, with a breezeway in the middle and stairs leading to the second level.
[2] The breezeway was well lighted when Mrs. Coleman saw the two men enter same.
[3] In the alternative, the defendant may also request a peremptory instruction of not guilty.
[4] Appellant contradicts himself.