# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-01715-SCT

*JASON DAVIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/11/2008 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL ELIAS WINFIELD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/16/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., RANDOLPH AND KITCHENS, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Jason Davis alleged that, on multiple occasions, he had been subjected to threatening and/or unlawful conduct by Thaddeus Jeffery. *See infra* ¶ 4-6.  On the evening of September 2, 2007, Davis claimed that Jeffery "ran up on" him in an Exxon station parking lot, began verbally confronting him, then stepped back and reached for his gun.  At that point, allegedly acting in self-defense, Davis removed his gun and fatally shot Jeffery.  Contrastingly, eyewitnesses at the Exxon station testified that they never saw Jeffery confront Davis and that they did not see Jeffery possessing a weapon.

¶2. Davis subsequently was indicted for the murder of Jeffery pursuant to Mississippi Code Section 97-3-19. *See* Miss. Code Ann. § 97-3-19 (Rev. 2006). Following a jury trial in the Circuit Court of Warren County, Mississippi, Davis was found guilty as charged and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections ("MDOC"). Soon thereafter, Davis filed a motion styled "Motion New Trial" based upon the "newly discovered evidence" of another witness to the shooting. Following a hearing, the circuit court denied Davis's motion, concluding that the evidence was both previously available and cumulative. Davis then filed a "Notice of Appeal."

**FACTS**

¶3. Davis alleges that he had a lengthy history of being subjected to threatening and/or unlawful conduct by Jeffery, whom he claims that he "didn't even know." Davis acknowledged that none of these alleged threatening and/or unlawful incidents, *see infra* ¶ 4-6, were reported to the police.

¶4. According to Davis, in the first such incident, he suspected that Jeffery had broken into his car and had stolen his CD player. Several days later, Davis's friend informed Davis that Jeffery had robbed him of $300 at gunpoint. While discussing this incident with his friend, Davis testified that Jeffery "pulled up . . . and was like, 'Yeah, b****, I robbed you. What you gonna do about it? I see you got that old weaky a** n***** with you. I'll blast him,' . . . referring to me." According to Davis, Jeffery further stated that "he was already facing time, he might as well kill us b****es." Davis testified that he "didn't say nothing" as he "didn't want to lead it on in no kind of way."

2

¶5. Davis testified that on a subsequent occasion, while he was walking up the steps to his aunt's home, which was near Jeffery's home, Jeffery allegedly "said, 'Don't bring your weaky a** around here.' And then I said, 'What?' . . . Then he said, 'Yeah, you'll get your b****y a** blasted on,' and was lifting up his shirt showing me his weapon . . . . I just ran on in the house . . . ." Davis and his friend, Marcus Luckett, testified regarding another alleged incident in which Jeffery pulled up next to Davis's car at a stop light and "flashed" his pistol at them.[1] Davis also testified about a different alleged incident where Jeffery "flashed" his gun at him.[2]

¶6. On the afternoon of September 2, 2007, Davis testified that as he entered the Exxon convenience store,[3] Jeffery entered behind him with "a real mean look on his face, but he never said nothing to me." According to Davis, as he was then driving away, Jeffery "was

---

[1]According to Luckett, Jeffery did not speak or point the weapon at them, but held it in his right hand "like showing it to us."

[2]Multiple witnesses also testified to Jeffery's reputation within the community. Lieutenant Linda Hearn, a crime-scene investigator for the Vicksburg Police Department, testified that she had heard of Jeffery and calls relating to him in the past, but never had any "personal dealings" with him. Likewise, Officer Damon Jacoby, an investigator with the Vicksburg Police Department, testified that "I knew that he had some cases pending, but for what, I don't know."
According to Davis, he heard that Jeffery "killed somebody at the club before[,]" and that "he's shot people, too, not necessarily killing them . . . ." Davis further recounted an incident where Jeffery allegedly robbed an "old man" of $50.
By contrast, Eddie Graves, Jeffery's close friend, testified that Jeffery was not a bully and "I'd never seen him just pick on nobody for no reason." Demetrus Banks, a friend of Davis and an acquaintance of Jeffery, testified that she heard Jeffery had a reputation of being "pretty tough," but that in her personal experience "he was . . . nice and cool."

[3]This Exxon station was the scene of the subsequent shooting at issue.

3

like, 'Yeah, b****, next time I see you, you better have your strap.' He lifted up his shirt again and showed me his gun . . . ."

¶7. On the evening of September 2, 2007, Davis was at the home of his cousin, Kaleshia Bowman. According to Bowman, Davis was intoxicated and:

> was telling us that . . . he had a pistol for [Jeffery] because he had been picking. And Crystal asked me to ride with her because she was going to follow him home. And we were going down Clay [S]treet and . . . she was trying to tell him to slow down. He looked at us, he smiled and kept going. Well, he went to the store, and we was following.

Conversely, Davis testified that he was not intoxicated, that they had left Bowman's home "because I wanted to show them my new girlfriend[,]" and that he intended to stop first at the Exxon station "to get some beer, some cigarettes, and some gas." According to Davis, while driving he:

> was in the far right lane. And [Jeffery] was in the left lane, and that's when I seen him. . . . As we were coming down the street pulling on to the store, like coming up to the light, he was like, "Hey, old b**** a** n*****." He had three other guys with him. And I . . . turned left in front of McDonald's and pulled right up to my pump [at the Exxon station].

¶8. Multiple witnesses testified to their recollections of the killing in the Exxon station parking lot. According to Graves, he was talking with Banks in the northwest corner of the parking lot when Jeffery arrived.[4] Graves testified that Jeffery exited his vehicle with a cell phone to his ear, was "talking loud," and "moments later I heard gunshots, three or four gunshots."[5] Banks testified that she was talking to Graves and another individual when she

---

[4]By contrast, Davis testified that Graves was one of the three individuals in Jeffery's vehicle.

[5]According to Graves, he was at such a distance that he could not decipher who was shooting.

4

"heard gunshots. So we looked up. So we seen two guys running. We seen somebody running behind somebody with a gun. . . . And we seen somebody ducking." According to Bowman, as Davis exited his car, Jeffery backed his vehicle up to Davis's vehicle,[6] such that Davis "could have went to the left, but not backwards or forward." Bowman testified that Jeffery then exited his car "with his right hand in his pocket and approached [Davis]."[7] According to Bowman, as Jeffery got out of his car "he was saying something, but I couldn't hear him because the windows was up and the radio was on." Bowman briefly looked away and testified that "when I turned back around [Davis] was shooting."

¶9.    According to Davis, "I was parked in my parking spot, where they seen my car at, and then that's when [Jeffery] came backing in." According to Davis, he was effectively "blocked . . . in[,]" so he removed his gun from his glove box and began walking toward the Exxon convenience store. Davis testified that Jeffery then:

> ran up on me,[8] he was like, "N*****, n*****, you think I'm a joke?" But he got so close on me, we were like forehead to forehead. He was like, "N*****, you think I'm a motherf***ing joke?" Then he started backing up, reaching for his gun. He had already showed it two times. That's when I just got mine out . . . .[9]

---

[6]Bowman testified that the Exxon parking lot was at full capacity at the time.

[7]According to Bowman, "I thought . . . [Jeffery] had a gun." By contrast, Graves and Banks testified that they never saw a weapon on Jeffery.

[8]At this time, Davis cocked his gun.

[9]Davis stated that based upon Jeffery's prior statements and actions, "I was like, man, he's fixing to kill me . . . ."

5

According to Davis, he began "shooting and running at the same time[,]" fearful "[b]ecause [Jeffery] had three other guys in the car with him. I didn't know if they were going to start shooting at me or what."

¶10. Jeffery sustained gunshot wounds to his left mid-back;[10] his upper left back near his left shoulder; and his right heel. Graves called 911 and then, aided by his cousin, placed Jeffery in Graves's car. During this process, Graves testified that he picked up only Jeffery's cell phone off the ground. Graves did not wait for emergency response personnel to arrive, but instead rushed Jeffery to River Region Hospital.

¶11. According to Lieutenant Hearn, when police arrived on the scene, Jeffery's vehicle "had been moved and no one knew where it had gone or who had taken it."[11] Lieutenant Hearn found one live round and four shell casings in the Exxon parking lot. Approximately seven hours after the shooting, Officer Jacoby searched Graves's vehicle and did not find any weapons therein.

¶12. In the late morning of September 3, 2007, Davis turned himself in to police. In a videotaped statement, Davis claimed that Jeffery, with a gun in his hand, ran up to him and stopped just before making physical contact. According to Davis, he felt intimidated and began shooting.

---

[10]According to expert testimony, this was the sole lethal gunshot wound.

[11]Jeffery's vehicle was recovered from the Big Black River approximately one year after the shooting incident.

¶13.    On January 30, 2008, Davis was indicted for the murder of Jeffery pursuant to Mississippi Code Section 97-3-19.  On September 8, 2008, the jury trial commenced.  Davis was found guilty as charged and sentenced to life imprisonment in the custody of the MDOC.

¶14.    On September 15, 2008, Davis filed a motion styled "Motion New Trial" which provided that:

> on September 11, 2008, counsel for [Davis], received a telephone call from Sylwanda Masters inquiring about the status of [Davis's] appeal.  During said conversation, [Masters] advised that she was present on the night in question and that [Jeffery] . . . definitely had a gun in his hand when he fell upon her vehicle, another vehicle and then the ground.  Additionally, [Masters] stated that [Jeffery] still had the weapon in his hand when he was placed in the vehicle to be transported away from the scene.[12]

Davis's motion added that such evidence "could not have been discovered by either party through the exercise of due diligence prior to the commencement of the trial[;]" was "not merely cumulative . . . as the evidence offered at trial did not address that [Jeffery] actually had his pistol drawn and in his hand[;]" and was of such evidentiary value as to "probably change the result if a new trial is granted . . . ."

---

[12]Attached to Davis's motion was the affidavit of Masters which stated, in part, that:

> I was at the convenience store . . . when [Jeffery] was shot by [Davis]. . . .  I could not see who was shooting . . . [but] I saw [Jeffery] fall against my vehicle with a gun in his hand. . . . [Jeffery] still had the pistol in his hand when he fell on the ground and even when the individuals placed him in the vehicle. [Davis] would be dead now had he not shot [Jeffery] first because [Jeffery] definitely was armed during the incident.  I have not communicated with [Davis] nor his attorney or the police concerning this incident as my brother had drowned not long prior to this incident . . . .

7

¶15.	Following a hearing on October 2, 2008, the circuit court concluded that "the information was available and . . . is cumulative, and I'm going to deny the motion for new trial." On October 10, 2008, Davis filed "Notice of Appeal."

## ISSUES

¶16.	This Court will consider:

(1) Whether the circuit court erred in denying Davis's "Motion for Directed Verdict" and/or "Motion New Trial."
(2) Whether the State committed *Brady*[13] violations in contravention of Davis's constitutional rights.
(3) Whether the circuit court erred in failing to present a manslaughter instruction to the jury.
(4) Whether the circuit court abused its discretion in denying Davis's "Motion New Trial" based upon newly discovered evidence.

## ANALYSIS

**I.	Whether the circuit court erred in denying Davis's "Motion for Directed Verdict" and/or "Motion New Trial."**

¶17.	At trial, Davis presented only a motion for directed verdict following the State's case-in-chief, which was overruled. Davis then presented his defense and rested. Davis offered no further motions before judgment. Following his conviction and sentence, Davis filed a "Motion New Trial" regarding only "newly discovered evidence." *See* Issue IV.

¶18.	A motion for directed verdict pertains to the sufficiency of the evidence. *See Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005). This Court has stated that:

> after a motion for directed verdict is overruled at the conclusion of the State's evidence, and the appellant proceeds to introduce evidence in his own behalf, the point is *waived*. In order *to preserve it*, the appellant *must renew his motion for a directed verdict at the conclusion of all the evidence*.

---

[13]*See Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

8

*Wright v. State*, 540 So. 2d 1, 3 (Miss. 1989) (quoting *Harris v. State*, 413 So. 2d 1016, 1018

(Miss. 1982)) (emphasis added). In *Wright*, this Court concluded that:

> [t]he appellants waived error, if any, in the court's refusal to grant them a
> directed verdict at the close of the State's case-in-chief when they proceeded
> to present evidence in their behalf. *Because they did not renew this motion by
> way of a motion for a directed verdict at the conclusion of the evidence or via
> a motion for a peremptory instruction, any objection they may have had to the
> sufficiency of the evidence is waived*.

*Wright*, 540 So. 2d at 4 (emphasis added). Based thereon, this Court concludes that Davis's

failure to "renew [his] motion by way of a motion for a directed verdict at the conclusion of

the evidence or via a motion for a peremptory instruction," constituted a waiver of his present

challenge regarding the sufficiency of the evidence. *Id*.

¶19.    "When reviewing a denial of a motion for a new trial *based on an objection to the

weight of the evidence*, we will only disturb a verdict when it is so contrary to the

overwhelming weight of the evidence that to allow it to stand would sanction an

unconscionable injustice." *Bush*, 895 So. 2d at 844 (emphasis added). While Davis did file

a post-trial motion styled "Motion New Trial," that motion addressed only "newly discovered

evidence" and failed to include any "objection to the weight of the evidence . . . ." *Id*.

Davis's "Motion New Trial" argument is addressed in Issue IV. However, based upon

Davis's failure to present to the circuit court a motion for new trial regarding the weight of

the evidence, this Court concludes that his present challenge to the weight of the evidence

is procedurally barred. *See Shelton v. Kindred*, 279 So. 2d 642, 644 (Miss. 1973) ("[t]his

Court may not act upon or consider matters which do not appear in the record and must

confine itself to what actually does appear in the record.").

¶20. Based upon the aforementioned analysis, this Court concludes that this issue is procedurally barred and therefore is without merit.

## II. Whether the State committed *Brady* violations in contravention of Davis's constitutional rights.

¶21. Prior to trial, Davis filed a "Motion for Discovery" requesting that the State "produce . . . all statements, reports and materials required pursuant to [R]ule 9.04 of the Miss[issippi] Uniform Rules of Circuit and County Court."[14] Davis now argues that "the State intentionally, deliberately and unfairly concealed and withheld exculpatory and material evidence from [Davis]. . . . The State failed to *provide [Davis] with a copy of* (1) the

---

[14]Rule 9.04(A) of the Uniform Circuit and County Court Rules provides, in pertinent part, that:

> [s]ubject to . . . subsection "B," . . . the prosecution *must disclose* to each defendant or to defendant's attorney, *and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request* and without the necessity of court order *the following* which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution.
>
> 1. Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, *together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness*;
>
> 2. *Copy of any written or recorded statement of the defendant* and the substance of any oral statement made by the defendant;
>
> . . .
>
> 5. *Any physical evidence and photographs relevant to the case or which may be offered in evidence.*

URCCC 9.04(A) (emphasis added).

10

surveillance video of the premises or (2) a copy of the recorded statement of [Davis] or (3) a statement from [Banks]." (Emphasis added.) The State responds that "these items of evidence were not particularly favorable to [Davis], . . . with reasonable diligence, each one could have been obtained, and . . . these items of evidence were substantively disclosed by the prosecution. Further, [Davis] cannot establish that this evidence would have made any difference in the outcome of this proceeding."

¶22.    "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ***Brady***, 373 U.S. at 87. This Court has held that:

> [t]o establish a ***Brady*** violation *a defendant must prove* the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence);[15] (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; *and* (4) that had the evidence been disclosed to the defense, a reasonable probability[16] exists that the outcome of the proceedings would have been different. [***United States v. Spagnoulo***, 960 F. 2d 990, 994 (11th Cir. 1992)], citing ***United States v. Meros***, 866 F. 2d 1304, 1308 (11th Cir. 1989), *cert. denied*, 493 U.S. 932, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989).

***Howard***, 945 So. 2d at 337 (quoting ***King v. State***, 656 So. 2d 1168, 1174 (Miss. 1995)) (emphasis added).

---

[15]"Evidence is favorable to an accused when the 'evidence is material . . . .'" ***Howard v. State***, 945 So. 2d 326, 337 (Miss. 2006) (quoting ***Simon v. State***, 857 So. 2d 668, 699 (Miss. 2003)).

[16]"A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." ***United States v. Bagley***, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985).

*Surveillance Video*

¶23. The surveillance video from the Exxon station shows only the inside of the convenience store, with no footage of the gas-pump/parking-lot area.[17] Officer Jacoby testified that the surveillance video was "grainy at best[,]" and that "you could see that you had some people around the front door, but I couldn't really decipher anything from the video." At trial, the parties stipulated that the surveillance video was not relevant, and it was marked only for identification.

¶24. At the subsequent hearing on Davis's "Motion New Trial," counsel for Davis maintained that the surveillance video "confirms that [Masters] was where she says she was at the time of this incident." Counsel for the State responded that Masters "is clearly visible in that video. So had the defense observed that video prior to trial, they could have seen . . . everybody who was in that store at the time of the shooting. So due diligence . . . would have been to review that video, see if there were any witnesses."

¶25. The surveillance video does show that Masters was at the Exxon convenience store at the time of the shooting incident. However, this Court questions whether the footage provided on the surveillance video may itself be considered "evidence favorable to the defendant . . . ." *Howard*, 945 So. 2d at 337. The surveillance video shows only the inside of the convenience store. As such, while it shows that Masters was present, it does not show what she allegedly witnessed. In fact, at trial, the parties stipulated that the surveillance video was not relevant. If the surveillance video is irrelevant, then Davis cannot prove either

_____

[17]According to Officer Jacoby, the convenience store clerks "said that the front video camera . . . was a dummy camera, it was not working."

12

that it was "favorable" to him or that, had it been disclosed, "a reasonable probability exists that the outcome of the proceedings would have been different." ***Id***. On that basis alone, this Court concludes that Davis failed to prove a ***Brady*** violation by the State with respect to the surveillance video. Alternatively, this Court will consider whether Davis could have obtained the surveillance video through the exercise of "any reasonable diligence[,]" as this is the crux of Davis's claim with respect to all three items of evidence at issue. ***Id***.

¶26. Davis does not dispute his awareness of the surveillance video's existence prior to trial, therefore, that aspect of disclosure is not at issue. Instead, Davis contends that the State was obligated to provide him with a copy of the surveillance video and failed to do so. Thus, the nature of the requirements imposed upon the State by Uniform Circuit and County Court Rule 9.04(A) are disputed.

¶27. According to the State, "[b]y the plain language of Rule 9.04, the prosecution is not required to make copies of all evidence, but to allow the defendant or the defendant's attorney access to the evidence so that they may copy it." Conversely, counsel for Davis argued at the October 2, 2008, hearing on Davis's "Motion New Trial" that actual copies are required, as "I've dealt with several district attorneys in this state, even the previous administration, and they give you copies of everything."

¶28. Rule 9.04(A) states that "the prosecution must disclose . . . and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request . . . the following . . . ." URCCC 9.04(A). This rule requires only that the State disclose the subject material's existence and permit the defendant or his counsel to "inspect, copy, test, and photograph" such "upon written request . . . ." URCCC 9.04(A). In short, the State is not

13

*required* to *provide* the defendant or his counsel with copies of such material, but instead must *permit* such material to be "inspect[ed], cop[ied], test[ed], and photograph[ed]" by the defendant or his counsel. *Id*. Alternatively, this Court concludes that the State did not suppress the surveillance video, and Davis failed to exercise "reasonable diligence" in seeking to obtain it. *Howard*, 945 So. 2d at 337. Based upon the aforementioned analysis, this Court concludes that this issue is without merit.

### Davis's videotaped statement

¶29. At trial, counsel for Davis objected to the admission of Davis's videotaped statement because "I've been given a transcription of it, but never the actual tape." The circuit court then permitted counsel for Davis to view the videotaped statement and "see if there's any discrepancies," before taking up the objection. After viewing the videotape, counsel for Davis acknowledged that any variations between the transcript and videotape were "slight" and not "germane." Nonetheless, Davis did not withdraw the objection. The State then argued that the videotape had not been suppressed because Davis had a transcript and "[i]t's not like this is the first time that they knew that there was actually a recorded statement." Ultimately, the circuit court overruled Davis's objection, finding that "[i]f there was any error, it was harmless . . . because he received a copy of the transcript and there was *no significant difference in the transcript and the tape*." (Emphasis added.)

¶30. Davis was provided with a transcript of his statement and does not dispute his awareness of the existence of a videotaped statement prior to trial. Based upon the analysis in ¶ 28, this Court concludes that the State did not suppress Davis's videotaped statement. *Howard*, 945 So. 2d at 337. Furthermore, as the transcript was not significantly different

14

from the videotaped statement, and the videotaped statement was admitted into evidence by the circuit court, this Court fails to see how Davis can prove that "proper disclosure" from his perspective would have created a "reasonable probability . . . that the outcome of the proceedings would have been different." *Id*. Accordingly, this Court concludes that this issue is without merit.

### Banks's statement

¶31. At trial, Banks testified that she gave a statement to police at the Exxon station on September 2, 2007. According to Banks, her statement to police was that she saw two men running, then one of the men ducking and the other man shooting him. Counsel for Davis objected to Banks's testimony, arguing that "she supposedly gave a statement. They've never given us a statement." The State responded that the report of Officer London White provided that Banks "saw one black male chasing another black male." The circuit court noted Davis's objection, and trial proceeded. After the State rested, counsel for Davis moved for a mistrial "based upon the fact that [Banks] was allowed to testify, and although I was given a summation of her statement, she gave a statement and we were not given that statement." The circuit court overruled Davis's motion.

¶32. As Banks was disclosed by the State as a witness, and a summary of her testimony was provided to Davis in the report of Officer White, this Court agrees with the State that "defense counsel had enough information to contact [Banks] and to interview her for more details if he was not satisfied with the details provided in the statement." Moreover, there is no evidence that Banks provided any separate statement other than that which was in Officer White's report. Finally, Banks's testimony regarding her statement to police was

15

consistent with both her testimony at trial and Officer White's report. Therefore, this Court fails to see how Davis can prove that "proper disclosure" from his perspective would have created a "reasonable probability . . . that the outcome of the proceedings would have been different." *Id*. Accordingly, this Court concludes that this issue is without merit.

### III. Whether the circuit court erred in failing to present a manslaughter instruction to the jury.

¶33. Davis failed to included a manslaughter instruction in his proposed jury instructions to the circuit court. Following closing arguments, the jury sent a note to the circuit judge asking, "[c]an there be a lesser charge?" A discussion with counsel followed, with the circuit judge noting that "[n]obody submitted a manslaughter instruction." The circuit judge asked counsel for Davis whether this was done "for tactical purposes[,]" to which counsel for Davis responded affirmatively, adding that he was "adamantly . . . against" a manslaughter instruction. Nonetheless, the circuit judge stated that "[t]he facts could possibly support a manslaughter[,]" and, upon agreement of the parties, such a manslaughter instruction would be submitted to the jury. The State expressed *no opposition* to a manslaughter instruction. Counsel for Davis then stated:

> I think they offered us a manslaughter plea. So . . . if he had wanted a manslaughter plea, . . . there was no point in us going to trial . . . , because they were willing to give us a manslaughter. . . . [T]hat was my thought process in not submitting a lesser-included instruction, but, now, we're not opposed necessarily. I'd like to speak to [Davis] before I agree to us doing a lesser-included instruction by agreement.

After conferring with Davis, counsel for Davis provided that "*we don't want to do the manslaughter. We'll just let it go how it is. If they convict him, they convict him.*" (Emphasis added.) Based thereon, no manslaughter instruction was presented to the jury.

16

¶34.    Davis now argues that he was entitled to a heat-of-passion manslaughter instruction as:

> [a] cursory review of the record reveals that [Jeffery's] actions created an environment in which any reasonable person would have been reasonably provoked to take defensive measures. Unfortunately, the [c]ircuit [c]ourt erred by failing to give any manslaughter instruction even . . . after the jury inquired about the availability of said lesser included offense.

The State responds that this issue is procedurally barred as "[n]ot only did Davis fail to object to the lack of a manslaughter instruction at any time during the proceedings, but his strategic decision prevented the instruction from being given, since the trial court indicated its willingness to give the jury a manslaughter instruction even at that late date."

¶35.    According to this Court:

> [m]any times we have stated that issues not presented to the trial court for lack of contemporaneous objection are procedurally barred, and error, if any, is waived. [Citations omitted.]   "We accept without hesitation the ordinarily sound principle that this Court sits to review actions of trial courts and that we should undertake consideration of no matter which has not first been presented to and decided by the trial court.  We depart from this premise only in unusual circumstances." *City of Starkville v. 4-County Elec. Power Ass'n*, 909 So. 2d 1094, 1111-12 (Miss. 2005).  Such departures are warranted as a means of preventing a manifest miscarriage of justice, *Johnson v. Fargo*, 604 So. 2d 306, 311 (Miss. 1992), i.e., the violation of a substantive right of a defendant, *Grubb v. State*, 584 So. 2d 786, 789 (Miss. 1991).  Such circumstances are required for this Court to consider plain error, despite failure to preserve such error.

*Dixon v. State*, 953 So. 2d 1108, 1116 (Miss. 2007).   Davis failed to provide a contemporaneous objection to the absence of a manslaughter instruction.  As such, this Court concludes that this issue is procedurally barred.  *See id.*  Moreover, Davis, after conferring with his attorney, elected to staunchly oppose the manslaughter instruction as part of his trial strategy, after being offered an opportunity to present such an instruction by the circuit court

17

and without opposition from the State. As such, this Court finds Davis's present argument disingenuous and cannot conclude that under these circumstances the circuit court's failure to provide a manslaughter instruction constituted plain error.[18] Accordingly, this Court concludes that this issue is without merit.

**IV. Whether the circuit court abused its discretion in denying Davis's "Motion New Trial" based upon newly discovered evidence.**

¶36. "The grant or denial of a new trial based on newly discovered evidence is within the discretion of the trial court, and this Court will not overrule the trial court unless it abused this discretion." ***Ormond v. State***, 599 So. 2d 951, 962 (Miss. 1992). This Court has stated that:

> [n]ewly discovered evidence warrants a new trial if the evidence will probably produce a different result or verdict; further, the proponent must show that the evidence "has been discovered ***since*** the trial, that it ***could not have been discovered before*** the trial by the exercise of due diligence, that it is material to the issue, and that it is ***not merely cumulative***, or impeaching."

*Id*. (quoting ***Smith v. State***, 492 So. 2d 260, 263 (Miss. 1986)) (emphasis added).

¶37. Davis argues that the surveillance video "revealed the existence of an additional witness [Masters] previously unknown to [Davis]." The State responds that the surveillance video was available to Davis before trial. Additionally, the State contends that such evidence was "cumulative" as "[t]he record contains testimony from three witnesses [Bowman, Luckett, and Davis] that Jeffery carried a gun and threatened Davis with it. It contains

---

[18]To find error would present the circuit judge with an untenable choice. If he gave the instruction against Davis's expressed will and Davis was convicted of manslaughter, then surely Davis would raise that ruling on appeal as error. If he did not give the instruction, as here, then he likewise would be found in error.

18

testimony from two witnesses [Bowman and Davis] that Jeffery had a gun on the night he was shot and reached in his pocket for it."

¶38.    Based upon the analysis in ¶ 28, concluding that "the State did not suppress the surveillance video and Davis failed to exercise 'reasonable diligence' in seeking to obtain such[,]" this Court cannot conclude that the circuit court abused its discretion in denying Davis's "Motion New Trial" because "the information was available . . . ." Additionally, Masters's proposed testimony was not so substantively different from the testimony of Bowman and Davis as to convince us that the circuit court abused its discretion in denying Davis's "Motion New Trial" by deeming Masters's proposed testimony "cumulative." Accordingly, this Court concludes that this issue is without merit.

## CONCLUSION

¶39.    Based upon this analysis, this Court affirms Davis's conviction and the attending sentence of life imprisonment in the custody of the MDOC imposed by the Circuit Court of Warren County.

¶40.    **CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**